## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

**CHARLES KELLY**, on behalf of himself
and all others similarly situated,

                         Plaintiff,

    v.

**COMMUNITY BANK, N.A**

                   Defendant.

Case No. _____

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff Charles Kelly, by counsel, and for his Class Action Complaint against the Defendant, he alleges as follows:

## INTRODUCTION

1.     This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, Community Bank, N.A. ("Community"), arising from a) the unfair and unconscionable assessment and collection of "Overdraft Fees" ("OD Fees") or insufficient funds fees ("NSF Fees") on accounts that were not actually overdrawn; and b) the assessment and collection of OD Fees or NSF Fees on intrabank payments and transfers.

2.     Besides being deceptive, unfair and unconscionable, these practices breach contract promises made in Community's adhesion contracts.

3.     In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that Community will <u>only</u> charge OD Fees or NSF Fees on transactions where there are insufficient funds to "cover" them.

4.     As happened to Plaintiff, however, Community charges OD Fees even when there are sufficient funds to "cover" a debit card transaction, and also charges OD Fees or NSF Fees on intrabank payments and transfers knowing that there are insufficient funds in its accountholders'

accounts at the time it attempts the payments and transfers.

5.     Moreover, Community abuses contractual discretion—specifically the promise to reject attempted transactions "if we feel it is inappropriate to extend credit/cover the transaction"—when it pushes through payments and transfers to itself, for the sole purpose of causing OD Fees and NSF Fees.

6.     Plaintiff and other Community customers have been injured by Community's practices. On behalf of himself and the putative class, Plaintiff seeks damages, restitution and injunctive relief for Community's breach of contract, deceptive practices.

## JURISDICTION

7.     This Court also has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1335(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and based upon information and belief, at least one of the members of the proposed classes is a citizen of a different state than Defendant.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

9.     Plaintiff Kelly is a natural person who is a citizen of Pennsylvania and resides in Greenfield Township, PA. Plaintiff has a personal checking account with Community, which is governed by Community's Deposit Agreement and Overdraft Practices document.

10.     Defendant Community is a credit union with approximately $10 billion in assets.

Defendant is one of the largest banks headquartered in St. Lawrence County, New York, making it a New York citizen, and maintains branch locations across the states of Massachusetts, New York, Pennsylvania, and Vermont.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

11.     Plaintiff has a checking account with Community.

12.     Community issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

13.     Pursuant to its standard account agreement, Community charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft.

## I.     COMMUNITY CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A.   Overview of Claim

14.     Mr. Kelly brings this cause of action challenging Community's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

15.     Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Community immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Community has already sequestered these funds for payment.

16.     However, Community still assesses harsh $35 OD Fees on many of these

transactions and mispresents its practices in its account documents.

17.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Community later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

18.     Community maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Community sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

19.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

20.     Still, despite keeping those held funds off-limits for other transactions, Community improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

21.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and

when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

22.     There is no justification for these practices, other than to maximize Community's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Community is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Community was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

23.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Community's adhesion contracts—contracts which fundamentally

misconstrue and mislead consumers about the true nature of Community's processes and practices. These practices also exploit contractual discretion to gouge consumers.

24.     In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Community will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

25.     In short, Community is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

26.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Community. When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to Community, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

27.     At this step, if the transaction is approved, Community immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

28.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

29.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

30.     Community (like all banks) decides whether to "pay" debit card transactions at authorization. After that, Community is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Community may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

31.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.  Community's Account Contract

32.     Plaintiff's Community checking account is currently governed by Community's standardized Deposit Agreement. Ex. 1.

33.     The Deposit Agreement and relevant contract documents covering OD Fees provide that Community will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated.

34.     Community's Deposit Agreement promises that overdraft determinations are made when a transaction is "authorized and paid":

OVERDRAFT PRACTICES –Under our standard Automated and Non-Automated Overdraft Protection Programs, the Bank may, at its discretion, *authorize and pay* certain overdraft items when you do not have sufficient available funds in your account. The Overdraft Protection Programs are not lines of credit. We do not guarantee that we will always pay any type of transaction and payment of an overdraft does not mean that future overdrafts will be paid. If we pay an overdraft, you agree that the total amount of the overdraft (including the amount of overdraft fees and other applicable fees) is due and payable on demand and that you are liable as set forth in this agreement and under applicable law. For consumer accounts, we may not pay overdrafts for ATM and everyday debit card transactions unless you authorize us to do so.

*Id*. at pp. 2-3 (emphasis added).

35.     The Overdraft Practices document, Ex. 2, states:

An overdraft occurs when you do not have enough money in your account to cover a transaction, but we cover the transaction on your behalf.

[…]

While we will have the discretion to cover overdrafts on accounts, any such payment is a discretionary courtesy, and not a right of the customer or an obligation of Bank. *Bank, in its sole and absolute discretion, can cease covering overdrafts at any time without prior notice of reason or cause if we feel it is inappropriate to extend credit/ cover the transaction.*

[…]

What are the standard overdraft practices that come with my account? We may *authorize and pay* overdraft items for the following types of transactions: ● Checks and other transactions made using your checking or money market account number ● Automatic bill payments ● Recurring debit card transactions (example: monthly membership dues) We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below): ● ATM transactions ● Everyday debit card transactions We may pay overdrafts at our discretion, which means we do not guarantee that we will always *authorize and pay* any type of transaction. If we do not *authorize and pay* an overdraft, your transaction will be declined.

[…]

You will not be charged an overdraft, NSF, or Consecutive Day OD fee if your aggregate overdrawn balance is less than $5.

(emphasis added).

36.     For debit card transactions, the bank decides whether to "authorize and pay" a debit card transaction at the moment of authorization. Community represents to its customers that it is one step, just like consumers using debit cards believe.

37.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are *always* funds to "cover" those transactions—yet Community assesses OD Fees on them anyway.

38.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN transactions.

39.     In fact, Community actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses the secret posting process described below.

40.     Community charges OD Fees even when sufficient funds exist to cover transactions that are "authorized and paid" into a positive balance.  No express language in any document states that Community may impose OD Fees on any APPSN Transactions.

41.     The account documents misconstrue Community's true debit card processing and overdraft practices.

42.     First, and most fundamentally, Community charges OD Fees on debit card transactions for which there are sufficient funds available to use to cover the transactions.

43.     Community assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

44.     Community's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between

Community's actual practice and the contract causes consumers like Mr. Kelly to incur more OD Fees than they should.

45.     Next, sufficient funds for APPSN Transactions are actually debited and held from the account immediately, consistent with standard industry practice.

46.     Because these withdrawals take place at authorization, they cannot be re-debited later. But that is what Community does when its re-debits the account during a secret batching posting process.

47.     In reality, Community's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

48.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, Community cannot then charge an OD fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

49.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Community does something new and unexpected by its customers, during the middle of the night, during its nightly batch posting process. Specifically, Community releases the hold placed on funds for the transaction for a split-second, putting money back into the account, and then re-debits the same transaction a second time.

50.     This secret step allows it to charge OD Fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which Community specifically set aside money to pay them.

51.     This discrepancy between Community's actual practices and the contract causes

accountholders to incur more OD Fees than they should.

52. In sum, there is a huge gap between Community's practices as described in the account documents and Community's practices in reality.

**D.** **Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

53. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

54. Community was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

55. Community knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

56. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* http://www.consumeraction.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_deb it_card (last visited July 11, 2019).

57. Further, Consumer Action informs consumers that "Debit cards offer the

convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *See* https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited July 11, 2019).

58. That is a large part of the reason that debit cards have risen in popularity. In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[1]

59. Not only have consumers increasingly switched from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

**E.  Plaintiff Kelly's Debit Card Transactions**

60. As an example, on June 3, 2019, Mr. Kelly was assessed an OD Fee in the amount of $35.00 for a DIRECTV debit card transaction authorized on May 31, 2019 that settled that day. However, that transaction was authorized and paid into a positive account balance prior to that day. Further, at that time of authorization, positive funds were deducted immediately for the debit card transaction on which he was later assessed an OD Fee.

**II.    COMMUNITY ASSESSESS OD AND NSF FEES ON TRANSFERS TO OTHER COMMUNITY ACCOUNTS AND ON PAYMENTS TO ITSELF**

**A.  Plaintiff's Experience**

61. Community charges OD Fees and NSF Fees—sometimes numerous fees for the

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited July 11, 2019).

same transactions—when it knows or is chargeable with knowing, that an accountholder's payment or transfer from a Community checking account to *another Community account* may cause the first account to become overdrawn. In other words, Community charges its accountholders $35 OD Fees or NSF Fees to attempt to pay or transfer funds to itself, or to reject a payment or transfer to itself, when it knows, or is chargeable with knowing, that the transferor account is or will be in an insufficient or overdrawn state if the payment or transfer is honored.

62.     This result is absurd, undisclosed, and an abuse of discretion under the contract.

63.     For example, Plaintiff made transfers from his checking account to his savings account with Community on March 11, 2019 and May 28, 2019. Both times, Community charged him $35 OD Fees*, even though it knew each transfer attempt would cause fees and massively reduce the effective amount transferred.*

64.     Since there is no contractual basis which permits Community to attempt to pay *itself* from an account that has insufficient funds to do so, this technique is beyond reasonable consumer expectations.

65.     Rather than cancelling or delaying the transfer to the savings account, based on its actual or chargeable knowledge of Plaintiff Kelly's account balances, Community pushed it through.  For pushing through attempts for intrabank transfers that it knew, or should have known, would be futile, Community charged Plaintiff Kelly multiple $35 OD Fees.

66.     This is true even though Community had the ability to check account balances before submitting transactions for intrabank transfers, using its bird's-eye view of all Community accounts.

67.     Furthermore, the practice is counter to the Electronic Fund Transfers Act Disclosure, attached hereto as Exhibit 3, which is part of the account documents that govern the relationship

between Community and its customers.  Specifically, the Electronic Fund Transfers Act Disclosure

provides:

> If you request that we automatically transfer funds on a specific date, we will make one attempt to electronically transfer the funds on that date. **If sufficient funds are not available, the transfer will not be completed.**

Ex. 3. at p. 4 (emphasis added). No reasonable consumer reading that would expect an OD Fee or

NSF Fee to be charged, as that is not mentioned as a possible outcome of an attempted intrabank

transfer.

68.    Community has the contractual discretion to reject transfer attempts. There is no

authorization or justification for Community to attempt a transaction to itself that it knows will

fail.

**B.  <u>The Purpose and Nature of OD and NSF Fees</u>**

69.    When a bank pays an overdraft, it is extending credit. It is very expensive credit,

indeed, according to the FDIC:

> For almost all study population banks operating an automated overdraft program, the main fee associated with the program was an NSF usage fee. Usage fees reported by these banks ranged from $10 to $38; the median fee was $27, charged on a per-transaction basis in almost all cases. In this context, a $27 fee charged for a single advance of $60 that was repaid in two weeks **roughly translated into an APR of 1,173 percent.** Many surveyed banks (24.6 percent) assessed additional fees on accounts that remained in negative balance status in the form of flat fees or interest charged on a percentage basis.

FDIC Study of Bank Overdraft Programs, 2008 (emphasis added).

70.    In a normal situation, when Community is making an approve or reject decision on

a transaction submitted by another entity for payment, Community usually has little or no insight

into the nature of the transaction or the costs and benefits of paying or returning that transaction.

As such, for those transactions Community relies exclusively on an automated, internal program

that makes pay or return decisions based on an accountholder's credit risk, past overdraft behavior,

and account balance history often called an overdraft coverage or matrix limit:

> As automated processes are necessary for institutions that choose to authorize or decline ATM and POS transactions that will overdraw an account, many institutions—including study banks—use these same processes to make pay-return decisions for check and ACH transactions. These institutions generally run programs that assign to each account a limit as to the amount of overdraft coverage the institution is willing to extend. For accounts that have opted in to ATM and POS debit overdraft coverage, when a request for authorization is received that exceeds the available funds, the bank will determine whether to authorize the transaction by reviewing it against the assigned overdraft coverage limit. Similarly, in nightly (or intra-day) posting, the bank will review potential NSF and overdraft items against the assigned overdraft coverage limit. Items processed during nightly (and intra-day) posting will generally be paid up to the coverage limit; once the account's limit is reached, subsequent items will be returned unpaid.

*CFPB Study of Overdraft Programs*, at 49.

71.     But when Community is deciding whether to submit, approve or reject transactions that transfer money to *other Community* accounts or that *pay itself*, Community is both the submitting Bank *and* the merchant being paid.  This provides Community with unique insight into, and control over, whether and how transactions to pay or transfer money to Community accounts are processed.

72.     Thanks to an aggressive "cross-selling" effort by Community, there are hundreds of thousands of Community checking accountholders who also regularly pay Community or transfer funds between Community accounts, because they also hold Community savings accounts, lines of credit, credit cards, and mortgages.

### C.  **Community Has Made a Major Effort to Cross-Sell Its Products, Promising Convenience and Efficiency but Also Providing It With a Bird's-Eye View of Its Accountholders' Financial Details**

73.     Banks like Community have made a major effort to "cross-sell" products. Consumers may have a checking account, but also a credit card, line of credit, and/or savings account, etc.

74.     This allows for assessment of additional fee revenue.

75.    Selling additional products to existing customers has long been a key priority for many banks with the explicit goal of improving the bottom line.

76.    As one industry publication put it: "Cross-selling comes with its advantages, of course. It considerably reduces customer acquisition costs, servicing, and marketing and communication costs and thereby substantially increases spread for banks. It is well understood and key finding that greater the number of products held by customer leads to an increased probability of retention." *Cross Selling at Banks: Adopting the Right Strategy for a Healthy Bottom Line*, Customer Think (Jan. 2010), available at http://customerthink.com/cross_selling_at_banks_adopting_right_strategy_for_health_bottom_line/ (last visited July 11, 2019).

77.    It continues: "The more relationships a bank has with a customer, the more loyal the customer will be and the bank gets to know the customer through several relationships, thus the assessment of the credit quality of the customer can be bettered. At the end it will be a win-win situation for both the bank and customer as it is cheaper and easier to get customer from one's own data base than going out for getting new customers. Banks should be careful in exploiting this situation and see that the bottom line along with the top line goes up and not just cross sell of products."

78.    Community shares information across accounts, targeting products and services, as it tracks in intimate detail various consumer accounts at once, giving the bank unique access to the complete financial picture of a consumer on an hour to hour basis.

79.    Community routinely and systematically shares detailed information across accounts. In some cases, the cross-selling and information gathering is used solely to charge consumers with fees and increase fee revenue.

D. **Community's Relevant Account Disclosures**

80.     The Overdraft Practices document, Ex. 2, states:

While we will have the discretion to cover overdrafts on accounts, any such payment is a discretionary courtesy, and not a right of the customer or an obligation of Bank. *Bank, in its sole and absolute discretion, can cease covering overdrafts at any time without prior notice of reason or cause if we feel it is inappropriate to extend credit/ cover the transaction.*

(emphasis added).

81.     Consistent with express representations in the contract, reasonable consumers understand that the Bank may "cease covering" payment orders and transfers to other Community accounts. It can do so without even submitting them unnecessarily. Read reasonably and in good faith, the contract indicates Community will not bother submitting a transaction when it knows attempted payment will be futile.

82.     Reasonable consumers are entitled to understand that Community will not use the intimate, detailed financial information regarding various Community accounts held by the same person as a tool to maximize NSF and OD Fees charged to them.

83.     Reasonable consumers believe the Bank would reject transfers or payments to itself, or to other Community accounts, when such transfers would cause a NSF or OD Fee to be charged.

84.     Reasonable consumers understand that transfers to Community accounts or payments to Community do not count as "items" that are subject to NSF or OD Fees, since Community has the right to protect its interests on the accounts that a consumer is attempting to transfer to or make a payment on. For example, if a consumer attempts a bill payment to a Community line of credit or credit card on insufficient funds, Community can charge a late fee in that circumstance. No reasonable consumer expects it will also charge OD Fees or NSF Fees on the originating account, and the Electronic Funds Transfer Act Disclosure states that the "transfer will not be completed" if "sufficient funds are not available. Ex. 3 at 4.

85.    Neither the Deposit Agreement nor any other account document ever states that transfers to other Community accounts incur NSF or OD Fees.

86.    The Deposit Agreement does not state that Community will attempt to push through a transfer or payment to itself, even where it knows, or should know, that it will cause an OD Fee or NSF Fee.

87.    Community exploits contractual discretion to the detriment of accountholders and breaches its duty of good faith and fair dealing when it applies these policies.

## <u>CLASS ALLEGATIONS</u>

88.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

89.    The proposed classes ("Classes") are defined as:

All Community Bank, N.A. checking accountholders in the United States who, during the applicable statute of limitations period through the date of class certification, were charged OD Fees on transactions that did not overdraw their checking accounts (the "National APPSN Class");

All Community checking accountholders in the state of Pennsylvania who, during the applicable statute of limitations period through the date of class certification, were charged OD Fees on transactions that did not overdraw their checking accounts (the "Pennsylvania APPSN Subclass");

All Community Bank, N.A. checking accountholders in the United States who, during the applicable statute of limitations, were charged NSF or OD Fees on transfers to other Community accounts or payments to itself (the "National Intrabank Transfer Fees Class").

All Community Bank, N.A. checking accountholders in the state of Pennsylvania who, during the applicable statute of limitations, were charged NSF or OD Fees on transfers to other Community accounts or payments to itself (the "Pennsylvania Intrabank Transfer Fees Subclass").

90.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes

before the Court determines whether certification is appropriate.

91.     Excluded from the Classes are Community, its parents, subsidiaries, affiliates, officers and directors; any entity in which Community has a controlling interest; all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

92.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the knowledge of and can be ascertained only by resort to Community's records.

93.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged OD Fees by Community on transactions that did not actually overdraw his checking account. The representative Plaintiff, like all members of the Classes, has been damaged by Community's misconduct in that they have been charged OD Fees or NSF Fees that violate the account contract. Furthermore, the factual basis of Community's misconduct is common to all members of the Classes and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

94.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members.

95.     Among the questions of law and fact common to the Classes are whether Community:

    a.     imposed OD Fees or NSF Fees on debit card transactions when those transactions did not overdraw accounts or on intrabank transfers;

    b.     imposed OD Fees or NSF Fees on intrabank transfers or payments to itself

knowing that there were insufficient funds in its accountholders' accounts at the time it attempts the payments and transfers;

c.      the proper method or methods by which to measure damages; and

d.      the declaratory relief to which Class members are entitled.

96.    Plaintiff's claims are typical of the claims of other members of the Classes, in that they arise out of the same wrongful overdraft policies and practices of Community. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other member of either Class.

97.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

98.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual member's claim is small relative to the complexity of the litigation, and due to the financial resources of Community, no member of either Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Community's misconduct will proceed without remedy.

99.    Even if members of the Classes could themselves afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard

which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiff and the Classes)

100.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

101.    Plaintiff and Community have contracted for bank account deposit, checking, ATM, and debit card services.

102.    Community breached promises included in the account documents as described herein when it charged OD Fees on APPSN transactions that did not overdraw checking accounts.

103.    Community also breached the account documents as described herein when it charged NSF Fees or OD Fees on transfers to other Community accounts or payments to itself.

104.    Under applicable state law, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

105.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A failure to act in good faith may be overt or

may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

106.    Community has also breached the covenant of good faith and fair dealing in its account agreement with customers through its overdraft policies and practices as alleged herein.

107.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

108.    Plaintiff and members of the Classes have sustained damages as a result of Community's breach of the contract.

**SECOND CLAIM FOR RELIEF**
**Violations of Pennsylvania Consumer Protection Laws**
**(On Behalf of Plaintiff and the Pennsylvania Subclasses)**

109.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

110.    This claim is asserted on behalf of the members of the Pennsylvania Subclasses under Pennsylvania 's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), PA ST 73 P.S. § 201-l, *et seq.*

111.    Community engaged in unfair and/or deceptive acts or practices relating to the imposition of overdraft fees on consumers, in violation of the UTPCPL, PA ST 73 P.S. § 201-1, *et seq.*

112.    The UTPCPL, PA ST 73 P.S. § 201-3 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

113.    PA ST 73 P.S. § 201-2(4)(xxi) defines "unfair methods of competition" and "unfair

or deceptive acts or practices" as "engaging in any other fraudulent tor deceptive conduct which creates a likelihood of confusion or misunderstanding."

114.    Pursuant to PA ST 73 P.S. § 201-9.2, et seq., Plaintiff and putative class members purchased services, in the form of banking services, from Community that were used primarily for personal; family or household purposes.

115.    Community engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the UTPCPL by, inter alia, knowingly and intentionally employing an unfair and deceptive policies and practices of assessing OD and NSF Fees, when a transaction was authorized on a positive balance and on intrabank transfers; and misrepresenting and failing to disclose its policies and practices of assessing OD and NSF Fees, when a transaction was authorized on a positive balance and on intrabank transfers.

116.    Community also engaged in unlawful conduct in violation of the UTPCPL by making knowing and intentional omissions. Community knowingly failed to disclose its policies and practices of assessing OD and NSF Fees, when a transaction was authorized on a positive balance and on intrabank transfers, in its account documents.

117.    Community intended that Plaintiff and putative class members rely on the acts of concealment and omissions, so that Plaintiff and putative class members would continue to incur overdraft fees.

118.    Community's conduct caused Plaintiff and putative class members to suffer ascertainable losses in the form of excessive overdraft fees that, but for Community's unfair and deceptive practices and policies, would not otherwise have been imposed.

119.    A causal relationship exists between Community's unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class. Had Community not acted unlawfully,

Plaintiff and putative class members would not have incurred excessive overdraft fees in violation of the UTPCPL.

120.    As redress for Community's repeated and ongoing violations of the UTPCPL, Plaintiff and putative class members are entitled to, inter alia, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.    Declaring Community's OD Fee policies and practices to be wrongful, unfair and unconscionable;

b.    Restitution of all OD Fees paid to Community by Plaintiff and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

c.    For each member of the National APPSN Class and National Intrabank Transfer Fees Class, actual damages in an amount according to proof;

d.    For each member of the Pennsylvania APPSN Class and Pennsylvania Intrabank Transfer Fees Class, actual damages, statutory damages, and/or treble damages in accordance with Pennsylvania law;

e.    Pre-judgment interest at the maximum rate permitted by applicable law;

f.    Costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

g.    Such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Dated: July 26, 2019

Respectfully submitted,

_____
James R. Peluso (Bar Roll # 105634)
**DREYER BOYAJIAN LaMARCHE SAFRANKO**
75 Columbia Street
Albany, NY 12210
Telephone: 518-463-7784
jpeluso@dbls.com

Jeffrey D. Kaliel (pro hac vice to be filed)
Sophia G. Gold (pro hac vice to be filed)
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C.  20009
Telephone: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielplllc.com

Jeffrey Ostrow (pro hac vice to be filed)
Jonathan M. Streisfeld (pro hac vice to be filed)
Daniel Tropin (pro hac vice to be filed)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
streisfeld@kolawyers.com
tropin @kolawyers.com

***Counsel for Plaintiff and the Proposed Classes***

# EXHIBIT 1

## TERMS AND CONDITIONS – ACCOUNT AGREEMENT

**AGREEMENT –** These terms, together with any applicable rules and Bank policies, all of which may be amended from time to time, govern the operation of your account unless modified or supplemented in writing. By signing the signature card when opening an account and through the continued use of the account, you agree to be bound by the terms and conditions set forth herein and any and all applicable rules and Bank policies as may be amended from time to time. As used in this form, the words "we," "our," or "us" mean the Bank and the words "you" or "your" mean the account holder(s). Notice from us to any one of you is notice to all of you. This account may not be transferred or assigned without our prior written consent.

**APPLICABLE LAWS –** Much of our relationship with our deposit customers is regulated by state and federal law, including the law regarding negotiable instruments, the law regulating the methods of transferring property upon death and the rights of surviving spouses and dependents, the law pertaining to estate and other succession taxes, the law regarding electronic funds transfer, and the law regarding the availability of deposited funds. This body of law is too large and complex to be reproduced here.

**PURPOSE –** The purpose of this Agreement is to:

(1) Summarize the rules applicable to the more common transactions;

(2) Establish rules to govern transactions or circumstances which the law does not regulate; and

(3) Establish rules for certain events or transactions which the law already regulates but permits variation by agreement.

In the event that any provision of this Agreement is held to be invalid for any reason, such holding shall not affect the enforceability of any other provision.

If there is a conflict between information stated in any Bank agreement or document (including this one) and something said by one of our employees, the Bank will adhere to the written information and the terms of this Agreement shall govern.

We may permit some variations from this standard Agreement, but any such variations must be agreed to by us in writing either on our signature card for the account or in some other written form.

**RESPONSIBLE PARTIES –** Each of you agrees, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges that may be imposed from time to time. You authorize us to deduct these charges as accrued directly from the account balance. You also agree to pay additional reasonable charges we may impose for services you request which are not contemplated by this Agreement. Each of you also agrees to be jointly and severally liable for any account deficit resulting from charges or overdrafts, whether caused by you or another person authorized to withdraw from this account, and the costs we incur to collect the deficit including, to the extent permitted by law, our reasonable attorneys' fees.

**DEPOSITS –** Any items, other than cash, accepted for deposit (including items drawn "on us") will be given provisional credit only until collection is final (and actual credit for deposits of, or payable in, foreign currency will be at our internal exchange rate). Subject to any other limitations, interest will be paid only on collected funds, unless otherwise provided by law. We are not responsible for transactions initiated by mail or outside depository boxes until we actually record them and all deposits are subject to later verification, count and adjustment by us. All transactions received on a day in which we are not open for business, will be treated and recorded as if initiated on the following business day that we are open.

**WITHDRAWALS –** Unless otherwise clearly indicated on the account records, any one of you who signs this Agreement (including current and subsequently authorized signers) may withdraw or transfer all or any part of the account balance at any time on forms approved by us. Each of you (until we receive written notice to the contrary) authorizes each other person signing this Agreement to endorse any item payable to you or your order for deposit to this account or any other transaction with us. The fact that we may honor withdrawal requests which overdraw the finally collected account balance does not obligate us to do so, unless required by law. Withdrawals will first be made from collected funds, and we may, unless prohibited by law, refuse any withdrawal request against uncollected funds, even if our general practice is to the contrary. We reserve the right to refuse any withdrawal or transfer request which is attempted by any method not specifically permitted, which is for an amount less than any minimum withdrawal requirement, or which exceeds any frequency limitation. Even if we honor a nonconforming request, repeated abuse of the stated limitations (if any) may eventually force us to close this account. We will use the date a transaction is completed by us (as opposed to the day you initiate it) to apply the frequency limitations. On interest-bearing accounts other than time deposits, we reserve the right to require at least seven days' written notice before any withdrawal or transfer. Withdrawals from a time deposit prior to maturity or prior to the expiration of any notice period may be restricted and may be subject to penalty. See your notice of penalties for early withdrawal.

If you request to withdraw large amounts in cash, we may place reasonable restrictions on the time and method of your withdrawal.

You agree not to issue incomplete, postdated or conditional checks or present such items for deposit to your account. Also, we have no duty to discover, comply with or have any liability for accepting any incomplete, postdated, conditional checks or checks more than six months old, even if you have provided us with notice describing this check.

**DEATH/INCOMPETENCE –** Your death, or a declaration that you are legally incompetent to handle your affairs, does not end our authority to pay checks signed by you, to accept deposits or to collect items deposited until we receive written notice of your death or declared incompetence and have a reasonable chance to act. Even after we receive notice, we may pay checks drawn by you before your death or declared incompetence for up to ten (10) days or any longer period permitted under applicable law.

**CHECK AND FORMS/PROTECTION OF DOCUMENTS –** You agree to maintain adequate safeguards to ensure the authorized use of the checks you retain, and agree to notify us immediately if you become aware that any checks are lost or stolen. We are not responsible for losses you may suffer due to improper printing on forms not obtained through or approved by us, your failure to maintain adequate safeguards against

unauthorized use, or your failure to issue checks in a manner so as to prevent unauthorized completion, alteration or addition.

**ACH AND WIRE TRANSFERS –** This Agreement is subject to Article 4A of the Uniform Commercial Code in the state in which you have your account with us. If you originate a fund transfer, and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Section 4A-403(e) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. If we receive a credit to an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit. International ACH originations are prohibited.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** You intend these rules to apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account signature card. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds. You expressly acknowledge and agree that any provision that appoints us as an agent is not subject to and is not to be construed in accordance with the provisions of 20 Pa.C.S.A. Section 5601 et seq. By exercising any of our rights under this Agreement, we do so for our sole benefit. **Individual Account** –is owned by one person. **Joint Account – With Survivorship (And Not As Tenants In Common)** – is owned by two or more persons. Deposits and any additions to the account are the property of the owners as joint tenants with right of survivorship. This means that we may release all or any part of the account to any owner as well as honoring withdrawal requests (including checks) from any owner. We may be required to release money in the account to satisfy a judgment against or other valid debt incurred by any owner. We may honor withdrawal requests (including checks) from any surviving owner after the death of any owner, and may treat the account as the sole property of the surviving owner(s). Any notice requesting us not to honor a withdrawal request (including checks) must be in writing from an owner and will be effective only after we have reasonable time to review and act upon request. After we receive such a notice, we may require the written authorization of any or all joint owners for any further payments or deliveries. **Revocable Trust Account** – If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries acquire the right to withdraw only if: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship.  Any such beneficiary may

withdraw all or any part of the account balance. The person(s) creating this account type reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the deposit at any time. **Corporate, Partnership, and Other Organizational Accounts –** We will usually require a separate authorization form designating the person(s) permitted and conditions required for withdrawal from any account in the name of a legal entity such as a partnership, corporation, or other organization. We will honor such authorization according to its terms until we receive and record a written amendment or termination from the governing body of such organization. *Authorized Signers for Business/Organizational Accounts*: You agree that each eligible signer as may be designated by you from time to time is authorized to endorse for collection, deposit, or negotiation any and all checks, drafts, notes, bills of exchange, certificates of deposit, and orders for the payment or transfer of money between accounts at the Bank and other banks, either belonging to or coming into the possession of the business. We are authorized to honor and pay all checks, drafts and orders when so signed or endorsed without inquiry as to the circumstances of issue or disposition of the proceeds even if doing so causes an overdraft or increases an overdraft and regardless of and to whom such instruments are payable or endorsed, including those drawn or endorsed to the individual order of any such person so listed.

In addition, each eligible signer is authorized to act for and on behalf of the business in any matter involving any designated account of the business, including the authority to instruct us to close the account, and is further authorized to sign and implement for and in the name on behalf of the business, as they, or any of them see fit, the terms of all agreements, instruments, drafts, certificates, or other documents relating to any depository accounts or other business including, but not limited to, night depository agreements, electronic banking, funds transfer agreements or safe deposit agreements.

**REVIEW OF YOUR STATEMENTS –** You must examine your statement of account with "reasonable care and promptness." If you discover any inconsistencies, unauthorized signatures, forgeries, or alterations, you must promptly notify us in writing of the relevant facts. As between you and us, if you fail to do either of these duties you will bear the entire loss. Your loss could include items on the statement, or other items with unauthorized signatures or alterations by the same wrongdoer, which we pay before we receive written notice from you. You agree the time that you have to examine the statement and report to us will not exceed 30 days from the earlier of the date the statement is made available to you by mail or electronically.

Refer to the Electronic Fund Transfers Act Disclosure, under separate cover, for your responsibility regarding electronic transaction disputes.

**OVERDRAFT PRACTICES –**Under our standard Automated and Non-Automated Overdraft Protection Programs, the Bank may, at its discretion, authorize and pay certain overdraft items when you do not have sufficient available funds in your account. The Overdraft Protection Programs are not lines of credit. We do not guarantee that we will always pay any type of transaction and payment of an overdraft does not mean that future overdrafts will be paid. If we pay an overdraft, you agree that

2

the total amount of the overdraft (including the amount of overdraft fees and other applicable fees) is due and payable on demand and that you are liable as set forth in this agreement and under applicable law. For consumer accounts, we may not pay overdrafts for ATM and everyday debit card transactions unless you authorize us to do so. You may authorize us to pay these items by contacting your local branch or calling 1-800-388-4679.

Under our Automated Program, eligibility requirements and dollar limitations, including limits on the amount of overdraft items paid on your behalf will apply.

Subject to certain notification requirements, overdraft and other applicable fees are subject to change. Bank may limit the number of overdraft fees that can be applied per day. The order in which transactions are processed, as set forth in our Overdraft Practices, can affect the total amount of fees incurred. Bank reserves the right to process transactions in any order, as permitted by state and federal law. Overdraft limits, current fees, daily fee limits, and transaction processing order are disclosed in the Bank's Overdraft Practices document (as amended from time to time) which is available in our branches or on our website.

If you do not wish to participate in our Automated Program or you no longer wish to authorize coverage for ATM and everyday debit card transactions under our program, you may contact your local branch or call 1-800-388-4679. If we do not pay an overdraft, your transaction will generally be returned or declined and certain fees may still apply. You may change your authorization at any time.

In general, we post transactions received on a daily basis in the following order: (1) all deposits received are posted; (2) withdrawals are grouped by transaction type and then processed. Items within each group are processed either in sequential order (i.e., check number order), or by dollar amount, with the lowest dollar amount transactions being processed before higher dollar amount transactions.

**STOP PAYMENTS** – A stop-payment order must be given in the manner required by law, must be received in time to give us a reasonable opportunity to act on it, and must precisely identify the number, date and amount of the item, and the payee. You agree that "reasonable opportunity" depends on the circumstances but that we will have acted within a reasonable time if we make your stop payment request effective by the end of the business day on which we receive your stop payment request. We will honor a stop-payment request by the person who signed the particular item, and, by any other person, even though such other person did not sign the item, if such other person has an equal or greater right to withdraw from this account than the person who signed the item in question. A release of the stop-payment request may be made only by the person who initiated the stop payment.

**LIMITS TO LIABILITY** - You agree that we shall be relieved of and you release us from any and all liability for acting upon your instructions or failing to act on your instructions when we reasonably believe that to do so would cause us to be exposed to civil or criminal liability, or conflict with customary banking practices. The Bank may refuse to follow any depositor instructions which we believe will expose us to potential liability under law. We may require adequate security to protect the Bank from any loss and expense incurred in following such instructions. You agree that we shall not be liable for indirect, special or consequential damages regardless of the form of action and even if we have been advised of the possibility of such damages. If we improperly fail to stop payment on an item, or improperly pay an item bearing an unauthorized signature, forged drawer's signature or forged endorsement or alteration, our liability, if any, shall be limited to the face amount of the item.

We are only responsible for providing services that are stated in this Agreement and do not assume fiduciary obligations on your behalf. There is no guarantee that access to our services will be available at all times and we shall not be liable for interruption in service or loss, or for our failure or delay to perform our obligations, caused by matters beyond our control such as, among others, natural disasters, acts of war, fire, terrorist attack (or threat thereof), strikes, computer failures, or losses of power, communications or transportation facilities.

**DIRECT DEPOSITS** – If, in connection with a direct deposit plan, we deposit any amount in this account which should have been returned to the Federal Government for any reason, you authorize us to deduct the amount of our liability to the Federal Government from this account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**SUB-ACCOUNTS -**For accounting purposes, all checking accounts consist of two sub-accounts: a transaction sub-account to which all financial transactions are posted and a holding sub-account into which available balances above a preset level are transferred daily. Funds will be re-transferred to your transaction sub-account to meet your transactional needs; however, all balances in the holding sub-account will be transferred to the transaction sub-account with the sixth transfer in any calendar month or monthly statement period. Both sub-accounts are treated as a single account for purposes of your deposits and withdrawals, access and information (i.e., your statements), tax reporting, fees, etc.

**TEMPORARY ACCOUNT AGREEMENT** – If this option is selected, we may restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**RIGHT TO SET-OFF; SECURITY INTEREST** – You each agree that we may, to the maximum extent permitted by applicable law, without prior notice or demand, apply or set off the funds in this account or any of your other accounts against any debt or liability (including fees or service charges) you owe us or any of our affiliates now or in the future, and you grant us a security interest in each account and all funds and other property in each such account to secure such debt as it may arise. We have this right even if the accounts(s) we withdraw money from is a joint account and the debt we apply it to is owed by only one of you. Likewise, we can withdraw money from an account owned by only one person and apply it to reduce the joint debt of that person or another person.

If the debt arises from a note, the set off amount includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the

3

note. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of the exercise of our right of set-off.

This right of set-off may not apply to this account if: (a) it is an Individual Retirement Account or other tax-deferred retirement account, or (b) the debt is created by a consumer credit transaction under a credit card plan, or (c) the debtor's right of withdrawal arises only in a representative capacity.

**USE OF FACSIMILE SIGNATURES AND COMPUTER SYSTEMS –** You authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money that are drawn on us regardless of by whom or by what means a facsimile signature(s) may have been affixed. Also, if you utilize an automatic check writing service, on-line banking, payment or other software systems, which may operate through the use of a computer or other internet device, you agree that you shall have the sole responsibility for maintaining security of any such computer or device. You further agree to indemnify and hold us harmless from and against any and all loss, cost, damage, liability or expense (including attorney's fees) that you or we may suffer or incur as a result of the unlawful use, unauthorized use or misuse by any person of any such device, computer, or software, any facsimile signature, computerized check, or misuse of access codes.

**RESTRICTIVE LEGENDS** – We are not required to honor any restrictive legend on checks you write unless we have agreed to the restriction in a writing signed by one of our officers. Examples of restrictive legends include, but are not limited to, "must be presented within 90 days" or "not valid for more than $1,000."

**TWO-SIGNATURE ACCOUNT RESTRICTIONS** – We do not offer accounts on which two signatures are required for a check or other withdrawal. Notwithstanding any provisions to the contrary on any signature card or other agreement you have with us, you agree that if any account purports to require two or more signers on items drawn on the account, such a provision is solely for your internal control purposes and is not binding on us. If more than one person is authorized to write checks or draw items on your account, you agree that we can honor checks signed by any authorized signer, even if there are two or more lines on the items for your signature and two signatures are required.

**FOREIGN CURRENCY** – Actively engaging in foreign exchange trading for profit or hedging purposes is strictly prohibited and may result in forfeiture or subsequent adjustments.

**AMENDMENTS AND TERMINATION –** We may change the terms of this Agreement from time to time as permitted by law. Your continued use of the account or continuation of the account for 30 days (or other required period) following the change will be deemed to be acceptance of the change by you. Rules governing changes in interest rates have been provided separately. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail.

**UNLAWFUL INTERNET GAMBLING -**In accordance with the requirements of the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG, this notification is to inform you that restricted transactions are prohibited from being processed through your account or relationship with our institution. Restricted transactions are transactions in which a person accepts credit, funds, instruments or other proceeds from another person in connection with unlawful Internet gambling.

**WAIVER –** The omission by us to require strict performance of any term or condition under this Agreement in any one or more instances shall not operate as a waiver of our right to insist upon strict performance of that or any other term or condition in the future. All waivers granted by us must be in writing and signed by us to be effective.

**JURY TRIAL WAIVER – SUBJECT TO APPLICABLE LAW, YOU AND WE AGREE TO WAIVE AND GIVE UP OUR RIGHTS TO A TRIAL BEFORE A JURY.**

4

# EXHIBIT 2

# Overdraft Practices

**Policy Statement.**
It is the policy of Community Bank, NA ("Bank" or "we") to comply with all applicable laws and regulations and to conduct business in accordance with applicable safety and soundness standards. The Bank offers both Automated and Non-Automated Overdraft Protection Programs to our customers, wherein for a fee, and subject to certain limitations, we may cover certain items presented for payment even though you do not have sufficient available funds in your account. This document is intended to summarize our general practices with regard to these programs. This document may be amended from time to time. If you have questions with regard to any of our practices or the status of certain transactions you should contact your local branch for assistance. Certain terms and conditions of this document may differ for commercial, municipal and other "non-consumer" accounts. Customers may decline to participate in key aspects of our Programs.

**Relationship to Deposit Account Terms and Conditions Agreement.**
The Deposit Account Terms and Conditions Agreement provided to you at the time you opened your account and as updated from time to time, as well as relevant state and federal law govern the obligations and rights of the account holder(s) and Bank with regard to your account. The Deposit Account Terms and Conditions Agreement (and all amendments thereto) shall control any conflict between this document and the Deposit Account Terms and Conditions Agreement. A copy of the current Deposit Account Terms and Conditions Agreement is available on request or on our website.

**General Terms.**
An overdraft occurs when you do not have enough money in your account to cover a transaction, but we cover the transaction on your behalf. An unavailable funds transaction occurs when you do not have sufficient available funds in your account to cover a transaction, but we cover the transaction on your behalf. While subject to change, our funds availability policy is to generally make funds from your deposits available to you on the next business day after the day we receive your deposit. Unless otherwise noted, for purposes of this document, overdraft and unavailable funds transactions will generally be referred to as "overdrafts". We can cover your overdrafts in different ways:

1. We offer a standard automated Overdraft Protection Program (Automated Program) with most accounts.
2. Accounts not enrolled in the Automated Program, will be referred to as Non-Automated Program accounts.
3. We also offer other products and services, such as overdraft credit lines or an overdraft sweep service from a savings or money market account (consumers only), which may be less expensive than our Automated and Non-Automated Overdraft Protection Programs. To learn more, ask us about these products or visit our website.

Helpful tips for avoiding overdrafts can be obtained through branch personnel and are periodically posted on our website at www.communitybankna.com. This document explains our standard Automated and Non-Automated Overdraft Protection Programs.

**Bank's right to refuse payment; Your obligation to pay.**
The Bank's Automated and Non-Automated Overdraft Protection Programs are not lines of credit. We are not obligated to cover any item presented for payment if your account does not contain sufficient funds. While we will have the discretion to cover overdrafts on accounts, any such payment is a discretionary courtesy, and not a right of the customer or an obligation of Bank. Bank, in its sole and absolute discretion, can cease covering overdrafts at any time without prior notice of reason or cause if we feel it is inappropriate to extend credit/ cover the transaction. If we do not authorize and cover an overdraft, your transaction will generally be returned or declined and certain fees may still apply. The total amount of any overdraft (including the amount of overdraft fees and other applicable fees) is due and payable on demand, and each relevant party will continue to be liable, jointly and severally, for all such amounts, as described in our agreements with you and under applicable law.

**Order of Processing.**
Generally speaking, we post transactions received on a daily basis in the following order:
1. All deposits received are posted.
2. Withdrawals are grouped by transaction type and then processed. Items within each group are processed either in sequential order (i.e., check number order), or by dollar amount, with the lowest dollar amount transactions being processed before higher dollar amount transactions.

**Fees.**
Subject to certain notification requirements, overdraft and related fees are subject to change. Fees may be waived at our discretion in certain circumstances. Our current overdraft and related fees are:

☐  We will charge you a fee of $32 each time we pay an overdraft, return an item due to insufficient funds (NSF)*, or pay an item based on unavailable funds.

☐  There is a four per day limit on each of the above fees we can charge you. It is the intention of Bank that customers not incur more than four combined overdraft, NSF, and unavailable funds fees per day. Customers charged more than four overdrafts, NSF, and unavailable funds fees in a single day will receive a rebate for each transaction in excess of four upon notifying Bank.

☐  We will charge you a fee of $5 for each consecutive business day your account remains overdrawn, starting on the 5th business day

*  You will not be charged an overdraft, NSF, or Consecutive Day OD fee if your aggregate overdrawn balance is less than $5.

**Automated Program Eligibility and Limits.**
If your account meets certain criteria, has been open for at least forty-five (45) days, and thereafter you maintain your account in good standing, Bank may extend coverage to you under our Automated Program and will have the discretion to cover transactions, generally up to a maximum limit. Maximum limits are determined by product type. This limit applies to the negative balance (including the amount of overdraft fees and other applicable fees) of your account. We may extend smaller limits for accounts open less than forty-five days and other limits may apply. Certain types of customers or accounts are generally not eligible (i.e., estates, rep payee, trusts, UTMA, PUTMA, student, IOLA, IOLTA funeral home, landlord/ tenant, non-profit, public funds, foreign customers). Other exclusions may apply. Enrollment in the Automated Program will be at the Bank's sole discretion. Customers may be removed from or re-instated into the Automated Program from time to time based on criteria established by the Bank. Eligibility and good standing criteria are determined at the discretion of the Bank and may change from time to time. Your account could become overdrawn in excess of the established Automated Program limit with Bank approval. As set forth above, our agreement to pay any charges up to or exceeding the limit will not require that we do so in the future or affect your obligations to repay. Customers may elect not to participate in our Automated Program by following the instructions set forth below. Customers not enrolled in the Bank's Automated Program will default to and be considered participants in the Non-Automated Program.

**Automated Program Covered Transactions and Elections.**
Covered Transactions under our Automated Program include all banking transactions that may result in an overdraft including but not limited to:

☐  In person withdrawals
☐  Checks
☐  ACH debit transactions (electronic payments)
☐  Online banking transactions
☐  Online Bill Pay transactions
☐  Telephone Banking Transfers
☐  Visa Check Card purchases
☐  ATM transactions

☐  Fees and charges from CBNA
☐  Returned deposited items
☐  Withdrawals by other electronic means

<u>For Consumer Accounts Only</u>, effective July 1, 2010 all new customers must tell us whether or not they wish to have ATM and everyday debit card transactions that would result in an overdraft paid. Prior to August 15, 2010 all consumer account holders were provided an opportunity to make this election. Consumer accounts that did not reply were deemed to have elected not to pay these items. See the document entitled "What You Need to Know About Overdrafts and Overdraft Fees" for more information about this election. Customers can make or change their elections at any time by calling or visiting their local branch; by calling 1-800-388-4679; or by completing the attached document referenced above.  Unless you instruct us otherwise (see below), regardless of whether or not you have ATM and everyday debit card transactions paid, customers are still enrolled in our Automated Program.

Customers may elect not to participate in our Automated Program by calling or visiting their local branch or by calling 1-800-388-4679. Bank reserves the right to remove or reinstate a customer from the Automated Program at its sole discretion from time to time and without advance notice.

**<u>Non-Automated Program Covered Transactions.</u>**
Customers not enrolled in the Bank's Automated Program (whether due to an election or at Bank's discretion) will default to and be considered participants in the Non-Automated Program. Among other factors, participants in our Non-Automated Program will have ATM and everyday debit card items that would result in an overdraft declined or rejected. In addition, participants in our Non-Automated Program will generally have other electronic transactions such as non-recurring debit card, in-branch, Internet banking, and telephone banking transactions rejected or declined, if at the time of the transaction it does not appear that sufficient funds are present. Exceptions may apply.

In general, for participants in the Non-Automated Program, branch personnel will make a determination to pay or return checks, ACH, and other applicable transactions that are presented, where the result of the transaction would be a negative balance due to insufficient funds. Overdraft, NSF, merchant and other fees may still apply.  In general, if an item is not paid it will be returned or rejected. NSF, merchant and other fees may still apply.

Overdraft Protection Program Practices Rev. 5/1/2014

# Community Bank N.A.

**What You Need to Know About Overdrafts and Overdraft Fees**

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdraft in two different ways:

1. We have **standard overdraft practices** that come with your account.
2. We also **offer overdraft protection plans**, such as a ChekCredit Line of Credit, or a sweep service from your savings or money market account, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our <u>standard overdraft practices</u>

➢ **What are the <u>standard overdraft practices</u> that come with my account?**
We <u>may</u> authorize and pay overdraft items for the following types of transactions:
- Checks and other transactions made using your checking or money market account number
- Automatic bill payments
- Recurring debit card transactions (example: monthly membership dues)

We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday debit card transactions

We may pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined.

➢ **What fees will I be charged if Community Bank, N.A. pays my overdraft or pays an item drawn on unavailable funds?**
Under our standard overdraft practices:
- We will charge you a fee of $32 each time we pay a non-sufficient* or overdraft* item or each time you draw on unavailable funds.
- Also, we will charge you a fee of $5 for each consecutive* business day your account remains overdrawn beginning on the 5th business day.
- *NSF/Overdraft/Consecutive OD fees are not assessed for aggregate overdrawn balances of less than $5.00
- Non-sufficient, Overdraft, and Unavailable Fund Fees are each limited to 4 per day.

➢ **What if I want Community Bank, N.A. to authorize and pay overdrafts on my ATM and everyday debit card transactions?** If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions complete the form below and present it to your local branch or mail it to: Community Bank, N.A. 1 Tallman Drive, Canton, New York 13617. You may revoke your consent at any time by contacting us either in person, or by mail or by phone.

---

| **Opt - In Authorization** | I want Community Bank, N.A. to authorize and pay overdrafts on ATM and every day debit card transactions. |
|---|---|
| Community Bank N.A. | Note that regulations require separate forms for each of your checking and money market accounts. |
| | **Account Number** _____ |
| | **Printed Name:**_____**Date**_____ |
| | **Signature** _____ |

# EXHIBIT 3



## ELECTRONIC FUND TRANSFERS ACT DISCLOSURE

### INTRODUCTION
This section addresses the terms and conditions which will apply when you use the Bank's Electronic Fund Transfer (EFT) services. It also explains your liability in using these services. All other terms and conditions for your account will also apply.

This disclosure statement is provided to you pursuant to Federal regulations. It summarizes the rights and responsibilities of both you and the Bank under the Electronic Funds Transfer Act when you conduct an electronic fund transfer. An electronic fund transfer is defined as any transfer of funds from or to a deposit account through use of a telephone, computer, an automated teller machine (ATM), a point of sale terminal (POS), mobile device, or a point of banking terminal (POB).

The words "you" and "your" mean any customer of Community Bank, N.A., who contracts to use electronic fund transfer services provided by the Bank. The words "we", "us", "our", or "Bank" refer to Community Bank, N.A. The word "pin" means personal identification number. The term "card" includes any access device provided by the Bank with which to affect an electronic fund transfer.

### RULES
This means the Bank's rules for its accounts, including those rules about the use of Electronic Fund Transfer services.

### AGREEMENTS
When you use our Electronic Fund Transfer services you give us the right to obtain payment of any funds you may owe us as a result of the transaction. Such payment may be obtained from funds you have on deposit with us.

**BR-005**
**Rev. 2/24/17**

This is in addition to any other rights we may have. Regardless of any other agreement you have with us, use of your Card is not secured by any real or personal property.

A Card and PIN will be issued upon your request. Without the Card and PIN you will be unable to use our electronic banking locations.

By requesting a Card, you agree to be bound by the terms and conditions listed in this Disclosure Statement.

You agree to maintain sufficient collected funds in your account to cover any electronic withdrawals or payments. If you do not have sufficient funds in your account, there may be a charge for each transaction that we are unable to process. You agree to be personally responsible for all charges incurred by use of your Card, including any overdrafts. An overdraft may result in cancellation of this agreement and your account.

### CARD SERVICES:

### ACCESS
*You may use your Card and PIN for the following transactions to/from one checking account, and/or one statement savings account and/or one money market account:*

- Balance Inquiries
- Cash Withdrawals
- Deposits at any ATM owned by us (proprietary ATM)
- Fund Transfers Between Accounts
- Pay For Purchases At POS Locations

### LIMITATIONS ON ATM WITHDRAWALS
**ATM CARDS:**
Our Bank limits customers to $500.00 in cash withdrawals at ATM machines each processing day*.

**(pcform)**

**DEBIT CARDS:**

Our Bank limits customers to $2,500.00 (dollars) in POS transactions each processing day*. **Please note the POS limit for customers that do not reside in the U.S. is $500.00 per processing day*.**

Our Bank limits customers to $500.00 in cash withdrawals from our ATMs each processing day*.

**\* The Bank's Processing Day extends from midnight (EST) to midnight of the following day.**

Passbook savings account rules prohibit preauthorized withdrawals or transfers from the account. ATM withdrawals are not permitted.

There may be different or additional limits on the amount of cash you can receive at an EFT Facility not operated by us. Also, deposits may not be made at a Facility not operated by us.

**CHARGES FOR EFT SERVICES:**

A fee will be charged for transactions conducted at an ATM which we do not own (non-proprietary ATMs). There may be a service fee imposed per month.
There will also be a fee per inquiry imposed.

**DOCUMENTATION OF TERMINAL TRANSACTIONS RECEIPTS**

You can get a receipt at the time you perform any transaction to or from your account when using one of our Automated Teller Machines (ATM).

**STATEMENTS**

You will get a monthly statement unless there are no EFT transactions in a particular month. In any case, you will get the statement at least quarterly.

For accounts where the only possible EFTs are preauthorized credits, you will receive an account statement at least quarterly.

For passbook savings accounts, if you bring your passbook to us we will record an electronic deposit that we made to your account since the last time you brought in your passbook.

**PRE-AUTHORIZED TRANSFERS**

If you have arranged to have regularly scheduled (at least once every 60 days) electronic transfers to or from your account by the government or the same person or company, you can call our telephone-banking line at **1-800-991-4280**, to find out if the transfer was made. For Social Security payments, please call us on or after the third of the month, to confirm that that month's payment has been received. (If the third of the month is a Saturday, Sunday or legal holiday you may call the prior business day.)

**OWNER'S LIABILITY FOR TRANSACTIONS BY ALL CARDHOLDERS**

The Owner of an account is fully responsible for all transactions processed by or permitted by anyone who is a Cardholder. Cardholders are separately responsible for whatever transactions they make or permit someone to make.

**CARDHOLDER'S LIABILITY FOR UNAUTHORIZED USE OF CARD**

You should notify us AT ONCE if you believe your Card is lost or stolen, or your PIN is known to someone other than yourself, and/or you believe someone has transferred or may transfer money from your account without your permission. Telephoning is the best way to keep your losses down. You could lose all of the money in your account plus the maximum amount of credit available in your line of credit. If you notify us within two business days after you learn of the loss or theft of your **ATM card**, $50 is the maximum you can lose if someone uses your Card or PIN without your permission. If you do not notify us within two business days and we prove that we could have stopped someone from using the Card or PIN if you had told us, you can lose as much as $500. When you notify the Bank that your **Debit Card** has been lost or stolen, you will not be held liable for any of the unauthorized transactions; unless the Bank can prove that you have committed fraud.

If your statement shows transfers that you did not authorize, tell us AT ONCE. If you do not tell us about an unauthorized transfer within 60 days after the statement was mailed to you, you will be liable for the lesser of $50 or the amount of any unauthorized transfer that appears on the statement or that occurs during the 60-day period. Also, you may not get any money back for transfers that occur after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.

If a good reason (such as a long trip or a hospital stay) kept you from telling us that your Card or PIN had been lost or stolen, or that a transfer occurred without your permission, we may extend the time periods.

2

**REPORTING LOST OR STOLEN CARDS**

**ATM CARDS:**
If you believe your ATM Card is lost or stolen, or your PIN is known to someone other than yourself, and/or you believe someone has transferred or may transfer money from your account without your permission, you should notify us AT ONCE by calling or writing:

**Community Bank, N.A**
**Attention: EFT**
**45-49 Court Street**
**Canton, N.Y. 13617**
**1-866-764-8638**
**Monday through Friday - 8:00 a.m. to 6:00 p.m.**

**You must contact your local COMMUNITY BANK, N.A. office to report any unauthorized use of your ATM Card.**

**DEBIT CARD:**
If you believe your Debit Card is lost or stolen, or your PIN is known to someone other than yourself, and/or you believe someone has transferred or may transfer money from your account without your permission, you should notify us AT ONCE by calling:

**Network Services**
**866-546-8273**

**You must report any unauthorized use of your Debit Card to your local COMMUNITY BANK, N.A.**

**Business Days:** Our business days are Monday - Friday. Federal Holidays are not included.

**ERRORS, OMISSIONS OR QUESTIONS**
If you believe there is an error or omission on your statement or receipt or if you need more information about a transfer listed on the statement or receipt, call or write us at: the address & telephone number listed above.

We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. When you call or write, you must tell us:

 a. Your name and account number,
 b. The error or transfer you are unsure about, and why you believe it is an error or why you need more information, and
 c. The dollar amount of the suspected error.

If you tell us orally, we may require that you also send us your complaint or question in writing within 10 business days.

**TRANSACTIONS INITIATED IN THE UNITED STATES, ITS TERRITORIES OR POSSESSIONS, OR THE COMMONWEALTH OF PUERTO RICO**
We will tell you the results of our investigation within 10 business days after we hear from you and will promptly correct any errors. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide we need to take this additional time, we will conditionally credit your account for the disputed amount within 10 business days, so that you have use of the money while we are completing our investigation.

**ALL POINT OF SALE (POS) TRANSACTIONS**
We will tell you the results of our investigations within 10 business days after we hear from you and will promptly correct any errors. If we need more time, however, we may take up to 90 days to investigate your complaint or question. If we decide we need to take this additional time, we will conditionally credit your account for the disputed amount within 10 business days, so that you have use of the money while we are completing our investigation.

**ALL TRANSACTIONS**
If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.  If we decide there was no error, we will send you a written explanation within three business days after we finish our investigation.  You can request copies of documents we use for our investigation. The Bank's record of your account is the one that will be binding if there is a difference between the Bank's record and your statement to us.

**THIRD PARTY DISCLOSURE**
We may disclose information about your account or transactions to third parties in the following circumstances:

- When it is necessary to complete transactions or resolve errors involving your account; or
- To verify the existence and condition of your account to third parties such as a credit bureau or merchant; or
- To comply with legal process, such as orders or subpoenas from government agencies or courts; or

3

- When you give your written permission to us or to the person asking for the information.

## FAILURE TO COMPLETE AN ELECTRONIC FUND TRANSFER

The Bank will make every effort to assure that your deposits, transfers and withdrawals are made quickly and correctly. If you request that we automatically transfer funds on a specific date, we will make one attempt to electronically transfer the funds on that date. If sufficient funds are not available, the transfer will not be completed.

If we do not complete a transfer to or from your accounts on time or in the right amount, according to our agreement with you, we are liable for your losses or damages (as provided by law). However there are some exceptions. We will not be liable, for instance, if:

-We do not receive sufficient information to complete the transaction.
-Through no fault of ours your account does not contain enough available funds to complete the transaction.
-Your account has been closed.
-Some other problem prevents us from completing the transaction the way you requested, and we are able to correct the problem and complete the transaction later.
-Your Card or PIN was reported lost or stolen.
-The ATM you are making the withdrawal at does not have enough cash.
-The ATM or our computer system was not working properly and you knew that when you started the transaction.
-Circumstances beyond our control (such as fire, flood, labor dispute, power or computer failure) prevent us from completing the transaction, despite reasonable precautions we have taken.
-Your Card and ATM privileges have been canceled.
-The transfer would exceed your credit limit on your line of credit.
-There are other instructions outlined in any agreement between the Bank and you.

## STOPPING PAYMENTS

### YOUR RIGHT TO STOP PAYMENT AND HOW TO DO IT

If we agreed in advance to make regular payments out of your account, you can order us to stop any of these payments by calling us or writing us at least three (3) business days before the payment is due to be made.
If you give us this notice in less than the required time, the Bank may, at its discretion, honor your request but it is not obligated to do so. If you place your stop payment order by telephone, we will also require you to put your request in writing and get it to us within 14 days after your call. Otherwise your oral request will expire. Unless you tell us that all future payments to that recipient are to be stopped, we will treat your stop payment as a request concerning the one particular payment only. If you wish to stop all future payments to that recipient, you must revoke the authorization you gave to that party to transfer funds from your account and provide us with a copy of your signed revocation. We may charge you a fee for each stop payment order you give us. If you change your mind after the stop payment order is on file, we may charge you a fee to cancel it.

To place or cancel a stop payment order call us or write us at the address & telephone number listed under the Lost/Stolen Cards section.

### THE BANK'S LIABILITY FOR FAILURE TO STOP PAYMENT

If you tell us to stop a pre-authorized transfer from your account and do so at least three business days before the transfer is scheduled, and we do not do so, we will be liable for any direct losses or damages you can prove.

### NOTICE OF VARYING AMOUNTS

If the pre-authorized payments out of your account will vary in amount, the person you are going to pay will tell you when the payment will be made and how much the payment will be. You will receive this information 10 days before each payment is due. You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

### FUTURE CHANGES AND CANCELLATIONS

We have the right to change this Agreement, and will notify you in writing at least 21 days before the effective date of any change that will:

1) Increase any fees or charges or your liability;
2) reduce the electronic fund transfer services available to you;
3) Place stricter limits on the frequency of transactions;
4) Decrease the daily maximum cash you can withdraw in a day.

No advance notice is required for changes that are necessary for security reasons.

4

## OVERPAYMENT

If funds to which you are not legally entitled are deposited into your account by mistake or otherwise, you agree that such amounts are debits owing from you to us and you authorize us to set off such amounts from the account or any other account you have with us to the extent permitted by law. We can do this without giving you any prior notice or demand.

## TERMINATION

We reserve the right to, at any time; terminate any of the electronic fund services which are described herein, by giving you written notice. You may, at any time, terminate any of the electronic fund services to which you subscribe by giving us written notice. Termination will not affect any of our rights or your obligations arising under this disclosure prior to termination.

## OWNERSHIP

Cards are the property of the Bank and are made available, along with the ATM's, as a service to our customers. If we request return of any Cards issued to you, you are required to return them immediately. We have the right to cancel your Card and privileges or this agreement at any time without advance notice to you.

## FEES

The following are fees related to EFT transactions:

ATM Cards:

| | |
|---|---|
| ATM Withdrawal Fee | $2.00 Per Withdrawal at a non-proprietary ATM * |
| ATM Inquiry Fee | $1.00 Per Inquiry at a Non-Proprietary ATM |
| ATM Balance Transfer | $2.00 Per Transfer at Non-Proprietary ATM |
| Replacement PIN# | $3.00 Per PIN# |
| Lost/Stolen Card | $5.00 Per card |
| POS Transaction | $1.00 Per transaction |
| International Service Fee | 1 % of transaction amount for International Transactions |

Debit Cards:

| | |
|---|---|
| ATM Withdrawal Fee | $2.00 Per Withdrawal at a Non-Proprietary ATM * |
| ATM Inquiry Fee | $1.00 Per Inquiry at a Non-Proprietary ATM |
| ATM Balance Transfer | $2.00 Per Transfer at Non-Proprietary ATMs |
| Replacement PIN# | $3.00 Per PIN # |
| Lost/Stolen Card | $5.00 Per card |
| International Service Fee | 1% of transaction amount for International transactions |

* A Non-Proprietary ATM is an ATM not owned by Community Bank, N.A.

NOTICE REGARDING ATM FEES BY OTHERS: If you use an automated teller machine that is not operated by us, you may be charged a fee by the operator of the machine and/or by an automated transfer network.

## INTERNATIONAL TRANSACTIONS

The exchange rate used for processing international transactions is selected by Visa from a range of rates available for the applicable central processing date, or it may be a government-mandated rate in effect for the applicable central processing date. See the fee chart above for international service fee associated with such transactions.