**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**CHARLES KELLY**, **TINA THOMPSON**
**and SCOTT DOXEY**, on behalf of
themselves and all others similarly situated,

Case No.   8:19-CV-00919 (MAD/CFH)

                              Plaintiffs,

v.

**COMMUNITY BANK, N.A**
                              Defendant.

**AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

COME NOW the Plaintiffs Tina Thompson and Scott Doxey[1], by counsel, and for their

Class Action Complaint against the Defendant, they allege as follows:

**INTRODUCTION**

1.      This is a civil action seeking monetary damages, restitution and declaratory relief

from Defendant, Community Bank, N.A. ("Community"), arising from a) the unfair and

unconscionable assessment and collection of "Overdraft Fees" ("OD Fees") or insufficient funds

fees ("NSF Fees") on accounts that were not actually overdrawn; and b) the assessment of OD

Fees on "phantom debits."

2.      Besides being deceptive, unfair and unconscionable, these practices breach contract

promises made in Community's adhesion contracts.

3.      In plain, clear, and simple language, the checking account contract documents

discussing OD Fees promise that Community will only charge OD Fees or NSF Fees on

transactions where there are insufficient funds to "cover" them; will not assess OD Fees or NSF

Fees on transfers or payments from one Community Bank account to another; and will not assess

---

[1] Plaintiff Charles Kelly was dismissed, per order of this court dated February 18, 2020 [D.E. 41].

fees on phantom debits.

4.      As happened to Plaintiffs, however, Community improperly charges bank fees in all these circumstances.

5.      Plaintiffs and other Community customers have been injured by Community's practices. On behalf of themselves and the putative class, Plaintiffs seek damages, restitution and injunctive relief for Community's breach of contract and deceptive practices.

## JURISDICTION

6.      This Court also has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1335(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and based upon information and belief, at least one of the members of the proposed classes is a citizen of a different state than Defendant.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

8.      Plaintiff Thompson is a natural person who is a citizen of Pennsylvania and resides in Shickshinny, PA. Plaintiff has a personal checking account with Community, which is governed by Community's Deposit Agreement and Overdraft Practices document.

9.      Plaintiff Doxey is a natural person who is a citizen of New York and resides in Friendship, NY. Plaintiff has a personal checking account with Community, which is governed by Community's Deposit Agreement and Overdraft Practices document.

10.    Defendant Community is a bank with approximately $10 billion in assets. Defendant is one of the largest banks headquartered in St. Lawrence County, New York, making it a New York citizen, and maintains branch locations across the states of Massachusetts, New York, Pennsylvania, and Vermont.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

11.    Plaintiffs each have a checking account with Community.

12.    Community allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

13.    Pursuant to its standard account agreement, Community charges fees (currently in the amount of $35) for transactions that purportedly result in an overdraft.

## I.    COMMUNITY CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

### A.  Overview of Claim

14.    Plaintiff Thompson brings this cause of action challenging Community's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

15.    Here's how it works.  At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Community immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount.  As a result, customers' accounts will always have sufficient available funds available to cover these transactions because Community has already sequestered these funds for payment.

16.     However, Community still assesses harsh $35 OD Fees or NSF Fees on many of these transactions and mispresents its practices in its account documents.

17.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Community later assesses OD Fees or NSF Fees on those same transactions when they purportedly settle days later into a negative balance.  These types of transactions are APPSN Transactions.

18.     Community maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made.  When a customer makes a purchase with a debit card, Community sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

19.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions.  This means that many subsequent transactions incur OD Fees or NSF Fees due to the unavailability of the funds sequestered for those debit card transactions.

20.     Still, despite keeping those held funds off-limits for other transactions, Community improperly charges OD Fees or NSF Fees on those APPSN Transactions, although the APPSN Transactions **always** have sufficient available funds to be covered.

21.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged.  Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above.  Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged.  Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions.  Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status.  But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures.  Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive.  Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

22.      There is no justification for these practices, other than to maximize Community's fee revenue.  APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance.  But Community is free to protect its interests and either reject those intervening transactions or charge OD Fees or NSF Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But Community was not content with these millions in fees. Instead, it sought millions *more* in fees on these APPSN

Transactions.

23.     Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in Community's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of Community's processes and practices. These practices also exploit contractual discretion to gouge consumers.

24.     In plain, clear, and simple language, the checking account contract documents covering OD Fees and NSF Fees promise that Community will only charge OD Fees and NSF Fees on transactions that have insufficient funds to cover that transaction.

25.     In short, Community is not authorized by contract to charge OD Fees nor NSF Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.  Mechanics of a Debit Card Transaction**

26.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from Community.  When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to Community, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

27.     At this step, if the transaction is approved, Community immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

28.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

29.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

30.     Community (like all banks) decides whether to "pay" debit card transactions at authorization.  After that, Community is obligated to pay the transaction no matter what.  For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  It is at that point—and only that point—when Community may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

31.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

C.  **Community's Account Contract**

32.     Plaintiff Thompson's Community checking account is currently governed by Community's standardized Deposit Agreement.  Ex. 1.

33.     The Deposit Agreement and relevant contract documents covering OD Fees and

NSF Fees provide that Community will not charge OD Fees or NSF Fees on transactions that have sufficient funds to cover them at the time they are initiated.

34.     Community's Deposit Agreement promises that overdraft determinations are made when a transaction is "authorized and paid":

> OVERDRAFT PRACTICES –Under our standard Automated and Non-Automated Overdraft Protection Programs, the Bank may, at its discretion, *authorize and pay* certain overdraft items when you do not have sufficient available funds in your account. The Overdraft Protection Programs are not lines of credit. We do not guarantee that we will always pay any type of transaction and payment of an overdraft does not mean that future overdrafts will be paid. If we pay an overdraft, you agree that  the total amount of the overdraft (including the amount of overdraft fees and other applicable fees) is due and payable on demand and that you are liable as set forth in this agreement and under applicable law. For consumer accounts, we may not pay overdrafts for ATM and everyday debit card transactions unless you authorize us to do so.

*Id*. at pp. 2-3 (emphasis added).

35.     The Overdraft Practices document, Ex. 2, states:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we cover the transaction on your behalf.
>
> […]
>
> While we will have the discretion to cover overdrafts on accounts, any such payment is a discretionary courtesy, and not a right of the customer or an obligation of Bank. *Bank, in its sole and absolute discretion, can cease covering overdrafts at any time without prior notice of reason or cause if we feel it is inappropriate to extend credit/ cover the transaction.*
>
> […]
>
> What are the standard overdraft practices that come with my account? We may *authorize and pay* overdraft items for the following types of transactions: • Checks and other transactions made using your checking or money market account number • Automatic bill payments • Recurring debit card transactions (example: monthly membership dues) We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below): • ATM transactions • Everyday debit card transactions We may pay overdrafts at our discretion, which means we do not guarantee that we will always *authorize and pay* any type of transaction. If we do not *authorize and pay* an overdraft,

your transaction will be declined.

[…]

You will not be charged an overdraft, NSF, or Consecutive Day OD fee if your aggregate overdrawn balance is less than $5.

(emphasis added).

36.     For debit card transactions, the bank decides whether to "authorize and pay" a debit card transaction at the moment of authorization.  Community represents to its customers that it is one step, just like consumers using debit cards believe.

37.     For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are *always* funds to "cover" those transactions—yet Community assesses OD Fees and NSF Fees on them anyway.

38.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance.  Of course, that is not true for APPSN transactions.

39.     In fact, Community actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions.  Instead, it uses the secret posting process described below.

40.     Community charges OD Fees and NSF Fees even when sufficient funds exist to cover transactions that are "authorized and paid" into a positive balance.  No express language in any document states that Community may impose fees on any APPSN Transactions.

41.     The account documents misconstrue Community's true debit card processing and overdraft practices.

42.     First, and most fundamentally, Community charges OD Fees and NSF Fees on debit

card transactions for which there are sufficient funds available to use to cover the transactions.

43.     Community assesses OD Fees and NSF Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

44.     Community's practice of charging OD Fees and NSF Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so.  This discrepancy between Community's actual practice and the contract causes consumers like Plaintiff Thompson to incur more OD Fees or NSF Fees than they should.

45.     Next, sufficient funds for APPSN Transactions are actually debited and held from the account immediately, consistent with standard industry practice.

46.     Because these withdrawals take place at authorization, they cannot be re-debited later. But that is what Community does when its re-debits the account during a secret batching posting process.

47.     In reality, Community's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

48.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, Community cannot then charge a fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

49.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Community does something new and unexpected by its customers, during the middle of the night, during its nightly batch posting process.  Specifically, Community releases the hold placed on funds for the transaction for a split-second, putting money

back into the account, and then re-debits the same transaction a second time.

50.     This secret step allows it to charge fees on transactions that never should have been subject to them—transactions that were authorized into sufficient funds, and for which Community specifically set aside money to pay them.

51.     This discrepancy between Community's actual practices and the contract causes accountholders to incur more OD Fees and NSF Fees than they should.

52.     In sum, there is a huge gap between Community's practices as described in the account documents and Community's practices in reality.

**D.  Reasonable Consumers Understand Debit Card Transactions are Debited Immediately**

53.     The assessment of OD Fees and NSF Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

54.     Community was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

55.     Community knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

56.     Consumer Action, a national nonprofit consumer education and advocacy

organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account.  Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* http://www.consumeraction.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_deb it_card (last visited July 11, 2019).

57.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending.  When you use a debit card, you do not get a monthly bill.  You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *See* https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited July 11, 2019).

58.     That is a large part of the reason that debit cards have risen in popularity.  In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[2]

59.     Not only have consumers increasingly switched from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

---

[2] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited July 11, 2019).

**E.  Plaintiff Thompson's Experiences**

60.     Plaintiff Thompson was wrongfully charged fees on several occasions.

61.     As an example, on September 16, 2017, Plaintiff Thompson made a $62.50 ATM withdrawal, a $20 ATM withdrawal and a $30.74 debit card payment to Sunoco.  Her balance was positive throughout that day.  Yet, two days later, on September 18, 2017, she was *assessed three* OD Fees in the amount of $35.00 each.  However, the transactions were authorized and paid into a <u>positive</u> account balance prior to that day.  Further, at that time of authorization, positive funds were deducted immediately for the debit card transaction on which she was later assessed the OD Fees.

62.     As another example, on January 30, 2017, Plaintiff Thompson made a $23.76 debit card payment to Sunoco.  Her balance was positive throughout that day.  Yet, two days later, she was assessed a $35 OD Fee.  However, that transaction was authorized and paid into a <u>positive</u> account balance prior to that day.  Further, at that time of authorization, positive funds were deducted immediately for the debit card transaction on which she was later assessed an OD Fee.

**II.     COMMUNITY BANK CHARGES OD FEES AND NSF FEES ON PHANTOM TRANSACTIONS**

**A.  Overview of Claim and Plaintiff Doxey's Experience**

63.     Plaintiff Doxey brings this cause of action challenging Community's practice of charging OD Fees and NSF Fees on phantom transactions.

64.     Several applications and websites, including Square, Airbnb, Paypal, and investment services like Merrill Lynch, use a verification process to confirm the validity of a user's bank account, so that the user can then seamlessly send and receive payments.

65.     As part of the account opening or validation process, to verify a user's bank

account, these entities will deposit and immediately withdraw a tiny amount, under one dollar. This deposit and withdrawal process occurs virtually simultaneously, and is designed solely to ensure the account is valid and the entity can communicate with the account by sending and then debiting a small amount to and from the account.

66.     No actual purchase or payment is involved in what is essentially a "test" transaction, and there is no change to the account balance.

67.     The bank account linking and verification process usually takes a few minutes.

68.     A bank like Community is notified and aware of this routine practice, just as it is aware and notified that an accountholder has made no purchase, debit or transaction when third parties verify a consumer's account with this method.

69.     Plaintiff Doxey has an online investment account with Merrill Lynch.

70.     On November 19, 2019, the Merrill Lynch service put this verification process into motion, with the sole and exclusive intent to verify that Plaintiff's Community account was valid and active.  To do this, it deposited two micro transactions of 94 cents and 83 cents, and then immediately withdrew the full amount of $1.77 that it had just deposited.  No purchase or transaction was made by Plaintiff Doxey, and no change to his account balance occurred.

71.     Nonetheless, Community charged Plaintiff Doxey a $35 OD Fee when it debited the micro transactions that had been deposited just minutes earlier.

72.     This OD Fee assessment violated Community's adhesion contract.

**B.  Community's Account Contract**

73.     Plaintiff Doxey has a Community checking account, which is governed by Community's standardized Deposit Agreement.

74.     The micro transaction verification process did not result in an "overdraft," as that

term is used in the Deposit Agreement, because Plaintiff Doxey always had sufficient available

funds for the micro debit made by Merrill Lynch:

> OVERDRAFT PRACTICES –Under our standard Automated and Non-Automated Overdraft Protection Programs, the Bank may, at its discretion, authorize and pay certain overdraft items when you do not have sufficient available funds in your account.

Deposit Agreement, 2-3.

75.     Accordingly, Community breached its contractual promises when it charges an OD

Fee or NSF Fee on the micro transaction verification process.

### C. **Community Abuses Contractual Discretion**

76.     In addition to Community's express breaches, Community exploits contractual

discretion to the detriment of accountholders when it assesses OD Fees and NSF Fees under this

policy.

77.     It was in bad faith for Community to charge OD or NSF Fees in the manner

described above.  To do so, it abused discretion it provided itself to assess OD Fees and NSF Fees.

The Overdraft Practices document, Ex. 2, states:

> While we will have the discretion to cover overdrafts on accounts, any such payment is a discretionary courtesy, and not a right of the customer or an obligation of Bank. *Bank, in its sole and absolute discretion, can cease covering overdrafts at any time without prior notice of reason or cause if we feel it is inappropriate to extend credit/ cover the transaction.*

(emphasis added).

78.     Community abused its discretion in charging an OD Fee or NSF Fee on the micro

transaction verification process.

79.     Community uses these contractual discretion points unfairly to extract OD Fees and

NSF Fees on a verification process that no reasonable consumer would believe could cause OD

Fees and NSF Fees.

## CLASS ALLEGATIONS

80.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity,

commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

81.     The proposed classes ("Classes") are defined as:

> All Community Bank, N.A. checking accountholders in the United States who,
> during the applicable statute of limitations period through the date of class
> certification, were charged OD Fees or NSF Fees on transactions that did not
> overdraw their checking accounts (the "National APPSN Class");

> All Community Bank, N.A. checking accountholders in the United States who,
> during the applicable statute of limitations, were charged OD Fees or NSF Fees as
> a result of a verification process on their accounts that resulted in no change to their
> account balances (the "National Phantom Debit Class").

82.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes

before the Court determines whether certification is appropriate.

83.     Excluded from the Classes are Community, its parents, subsidiaries, affiliates,

officers and directors; any entity in which Community has a controlling interest; all customers who

make a timely election to be excluded; governmental entities; and all judges assigned to hear any

aspect of this litigation, as well as their immediate family members.

84.     The members of the Classes are so numerous that joinder is impractical. The Classes

consist of thousands of members, the identities of whom are within the knowledge of and can be

ascertained only by resort to Community's records.

85.     The claims of the representative Plaintiffs are typical of the claims of the Classes in

that the representative Plaintiff, like all members of the Classes, was charged improper OD Fees

or NSF Fees for the same reason. . The representative Plaintiff, like all members of the Classes,

has been damaged by Community's misconduct in that they have been charged OD Fees or NSF Fees that violate the account contract. Furthermore, the factual basis of Community's misconduct is common to all members of the Classes and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

86.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members.

87.    Among the questions of law and fact common to the Classes are whether Community:

      a.     imposed OD Fees or NSF Fees on debit card transactions when those transactions did not overdraw accounts;

      b.     imposed OD Fees or NSF Fees as a result of a verification process on their accounts that resulted in no change to their account balances;

      c.     the proper method or methods by which to measure damages; and

      d.     the declaratory relief to which Class members are entitled.

88.    Plaintiffs' claims are typical of the claims of other members of the Classes they each seek to represent, in that they arise out of the same wrongful overdraft policies and practices of Community.  Plaintiffs have suffered the harm alleged and has no interests antagonistic to the interests of any other member of either Class.

89.    Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

90.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Since the amount of each individual member's claim is small relative to the complexity of the litigation, and due to the financial resources of Community, no member of either Class could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Community's misconduct will proceed without remedy.

91.     Even if members of the Classes could themselves afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

### FIRST CLAIM FOR RELIEF
### Breach of Contract
**(On Behalf of Plaintiffs and the Classes)**

92.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

93.     Plaintiffs and Community have contracted for bank account deposit, checking, ATM, and debit card services.

94.     With respect to Plaintiff Thompson, and those similarly situated, Community breached promises included in the account documents as described herein when it charged OD Fees or NSF Fees on APPSN transactions that did not overdraw checking accounts.

95.     With respect to Plaintiff Doxey, and those similarly situated, Community also

breached the account documents when it charged OD Fees or NSF Fees as a result of a verification process on their accounts that resulted in no change to their account balances.

96.     Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

97.     Plaintiffs and members of the Classes have sustained damages as a result of Community's breach of the contract.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

a.      Declaring Community's OD Fee and NSF Fee policies and practices to be wrongful, unfair and unconscionable;

b.      Restitution of all OD Fees and NSF Fees paid to Community by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

c.      For each member of the Classes, actual damages in an amount according to proof;

d.      Pre-judgment interest at the maximum rate permitted by applicable law;

e.      Costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

f.      Such other relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Dated: February 28, 2020                    Respectfully submitted,

                                            By: *s/Jonathan M. Streisfeld*
                                            Jeffrey Ostrow (*pro hac vice*)
                                            Jonathan M. Streisfeld (*pro hac vice*)
                                            Daniel Tropin (*pro hac vice*)
                                            **KOPELOWITZ OSTROW**

**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
streisfeld@kolawyers.com
tropin@kolawyers.com

James R. Peluso, Esq. (105634)
**DREYER BOYAJIAN LLP**
75 Columbia Street
Albany, New York 12210
Telephone: (518) 463-7784
*jpeluso@dblawny.com*

Jeffrey D. Kaliel (*pro hac vice*)
Sophia G. Gold (*pro hac vice*)
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C.  20009
Telephone: (202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielplllc.com*

***Counsel for Plaintiffs and the Proposed Classes***

# EXHIBIT 1

## TERMS AND CONDITIONS – ACCOUNT AGREEMENT

**AGREEMENT –** These terms, together with any applicable rules and Bank policies, all of which may be amended from time to time, govern the operation of your account unless modified or supplemented in writing. By signing the signature card when opening an account and through the continued use of the account, you agree to be bound by the terms and conditions set forth herein and any and all applicable rules and Bank policies as may be amended from time to time. As used in this form, the words "we," "our," or "us" mean the Bank and the words "you" or "your" mean the account holder(s). Notice from us to any one of you is notice to all of you. This account may not be transferred or assigned without our prior written consent.

**APPLICABLE LAWS –** Much of our relationship with our deposit customers is regulated by state and federal law, including the law regarding negotiable instruments, the law regulating the methods of transferring property upon death and the rights of surviving spouses and dependents, the law pertaining to estate and other succession taxes, the law regarding electronic funds transfer, and the law regarding the availability of deposited funds. This body of law is too large and complex to be reproduced here.

**PURPOSE –** The purpose of this Agreement is to:

(1) Summarize the rules applicable to the more common transactions;

(2) Establish rules to govern transactions or circumstances which the law does not regulate; and

(3) Establish rules for certain events or transactions which the law already regulates but permits variation by agreement.

In the event that any provision of this Agreement is held to be invalid for any reason, such holding shall not affect the enforceability of any other provision.

If there is a conflict between information stated in any Bank agreement or document (including this one) and something said by one of our employees, the Bank will adhere to the written information and the terms of this Agreement shall govern.

We may permit some variations from this standard Agreement, but any such variations must be agreed to by us in writing either on our signature card for the account or in some other written form.

**RESPONSIBLE PARTIES –** Each of you agrees, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges that may be imposed from time to time. You authorize us to deduct these charges as accrued directly from the account balance. You also agree to pay additional reasonable charges we may impose for services you request which are not contemplated by this Agreement. Each of you also agrees to be jointly and severally liable for any account deficit resulting from charges or overdrafts, whether caused by you or another person authorized to withdraw from this account, and the costs we incur to collect the deficit including, to the extent permitted by law, our reasonable attorneys' fees.

**DEPOSITS –** Any items, other than cash, accepted for deposit (including items drawn "on us") will be given provisional credit only until collection is final (and actual credit for deposits of, or payable in, foreign currency will be at our internal exchange rate). Subject to any other limitations, interest will be paid only on collected funds, unless otherwise provided by law. We are not responsible for transactions initiated by mail or outside depository boxes until we actually record them and all deposits are subject to later verification, count and adjustment by us. All transactions received on a day in which we are not open for business, will be treated and recorded as if initiated on the following business day that we are open.

**WITHDRAWALS –** Unless otherwise clearly indicated on the account records, any one of you who signs this Agreement (including current and subsequently authorized signers) may withdraw or transfer all or any part of the account balance at any time on forms approved by us. Each of you (until we receive written notice to the contrary) authorizes each other person signing this Agreement to endorse any item payable to you or your order for deposit to this account or any other transaction with us. The fact that we may honor withdrawal requests which overdraw the finally collected account balance does not obligate us to do so, unless required by law. Withdrawals will first be made from collected funds, and we may, unless prohibited by law, refuse any withdrawal request against uncollected funds, even if our general practice is to the contrary. We reserve the right to refuse any withdrawal or transfer request which is attempted by any method not specifically permitted, which is for an amount less than any minimum withdrawal requirement, or which exceeds any frequency limitation. Even if we honor a nonconforming request, repeated abuse of the stated limitations (if any) may eventually force us to close this account. We will use the date a transaction is completed by us (as opposed to the day you initiate it) to apply the frequency limitations. On interest-bearing accounts other than time deposits, we reserve the right to require at least seven days' written notice before any withdrawal or transfer. Withdrawals from a time deposit prior to maturity or prior to the expiration of any notice period may be restricted and may be subject to penalty. See your notice of penalties for early withdrawal.

If you request to withdraw large amounts in cash, we may place reasonable restrictions on the time and method of your withdrawal.

You agree not to issue incomplete, postdated or conditional checks or present such items for deposit to your account. Also, we have no duty to discover, comply with or have any liability for accepting any incomplete, postdated, conditional checks or checks more than six months old, even if you have provided us with notice describing this check.

**DEATH/INCOMPETENCE –** Your death, or a declaration that you are legally incompetent to handle your affairs, does not end our authority to pay checks signed by you, to accept deposits or to collect items deposited until we receive written notice of your death or declared incompetence and have a reasonable chance to act. Even after we receive notice, we may pay checks drawn by you before your death or declared incompetence for up to ten (10) days or any longer period permitted under applicable law.

**CHECK AND FORMS/PROTECTION OF DOCUMENTS –** You agree to maintain adequate safeguards to ensure the authorized use of the checks you retain, and agree to notify us immediately if you become aware that any checks are lost or stolen. We are not responsible for losses you may suffer due to improper printing on forms not obtained through or approved by us, your failure to maintain adequate safeguards against

unauthorized use, or your failure to issue checks in a manner so as to prevent unauthorized completion, alteration or addition.

**ACH AND WIRE TRANSFERS –** This Agreement is subject to Article 4A of the Uniform Commercial Code in the state in which you have your account with us. If you originate a fund transfer, and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Section 4A-403(e) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. If we receive a credit to an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit. International ACH originations are prohibited.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** You intend these rules to apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account signature card. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds. You expressly acknowledge and agree that any provision that appoints us as an agent is not subject to and is not to be construed in accordance with the provisions of 20 Pa.C.S.A. Section 5601 et seq. By exercising any of our rights under this Agreement, we do so for our sole benefit. **Individual Account –**is owned by one person. **Joint Account – With Survivorship (And Not As Tenants In Common) –** is owned by two or more persons. Deposits and any additions to the account are the property of the owners as joint tenants with right of survivorship. This means that we may release all or any part of the account to any owner as well as honoring withdrawal requests (including checks) from any owner. We may be required to release money in the account to satisfy a judgment against or other valid debt incurred by any owner. We may honor withdrawal requests (including checks) from any surviving owner after the death of any owner, and may treat the account as the sole property of the surviving owner(s). Any notice requesting us not to honor a withdrawal request (including checks) must be in writing from an owner and will be effective only after we have reasonable time to review and act upon request. After we receive such a notice, we may require the written authorization of any or all joint owners for any further payments or deliveries. **Revocable Trust Account –** If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries acquire the right to withdraw only if: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. Any such beneficiary may

withdraw all or any part of the account balance. The person(s) creating this account type reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the deposit at any time. **Corporate, Partnership, and Other Organizational Accounts –** We will usually require a separate authorization form designating the person(s) permitted and conditions required for withdrawal from any account in the name of a legal entity such as a partnership, corporation, or other organization. We will honor such authorization according to its terms until we receive and record a written amendment or termination from the governing body of such organization. *Authorized Signers for Business/Organizational Accounts*: You agree that each eligible signer as may be designated by you from time to time is authorized to endorse for collection, deposit, or negotiation any and all checks, drafts, notes, bills of exchange, certificates of deposit, and orders for the payment or transfer of money between accounts at the Bank and other banks, either belonging to or coming into the possession of the business. We are authorized to honor and pay all checks, drafts and orders when so signed or endorsed without inquiry as to the circumstances of issue or disposition of the proceeds even if doing so causes an overdraft or increases an overdraft and regardless of and to whom such instruments are payable or endorsed, including those drawn or endorsed to the individual order of any such person so listed.

In addition, each eligible signer is authorized to act for and on behalf of the business in any matter involving any designated account of the business, including the authority to instruct us to close the account, and is further authorized to sign and implement for and in the name on behalf of the business, as they, or any of them see fit, the terms of all agreements, instruments, drafts, certificates, or other documents relating to any depository accounts or other business including, but not limited to, night depository agreements, electronic banking, funds transfer agreements or safe deposit agreements.

**REVIEW OF YOUR STATEMENTS –** You must examine your statement of account with "reasonable care and promptness." If you discover any inconsistencies, unauthorized signatures, forgeries, or alterations, you must promptly notify us in writing of the relevant facts. As between you and us, if you fail to do either of these duties you will bear the entire loss. Your loss could include items on the statement, or other items with unauthorized signatures or alterations by the same wrongdoer, which we pay before we receive written notice from you. You agree the time that you have to examine the statement and report to us will not exceed 30 days from the earlier of the date the statement is made available to you by mail or electronically.

Refer to the Electronic Fund Transfers Act Disclosure, under separate cover, for your responsibility regarding electronic transaction disputes.

**OVERDRAFT PRACTICES –**Under our standard Automated and Non-Automated Overdraft Protection Programs, the Bank may, at its discretion, authorize and pay certain overdraft items when you do not have sufficient available funds in your account. The Overdraft Protection Programs are not lines of credit. We do not guarantee that we will always pay any type of transaction and payment of an overdraft does not mean that future overdrafts will be paid. If we pay an overdraft, you agree that

2

the total amount of the overdraft (including the amount of overdraft fees and other applicable fees) is due and payable on demand and that you are liable as set forth in this agreement and under applicable law.  For consumer accounts, we may not pay overdrafts for ATM and everyday debit card transactions unless you authorize us to do so.  You may authorize us to pay these items by contacting your local branch or calling 1-800-388-4679.

Under our Automated Program, eligibility requirements and dollar limitations, including limits on the amount of overdraft items paid on your behalf will apply.

Subject to certain notification requirements, overdraft and other applicable fees are subject to change.  Bank may limit the number of overdraft fees that can be applied per day.  The order in which transactions are processed, as set forth in our Overdraft Practices, can affect the total amount of fees incurred.  Bank reserves the right to process transactions in any order, as permitted by state and federal law.  Overdraft limits, current fees, daily fee limits, and transaction processing order are disclosed in the Bank's Overdraft Practices document (as amended from time to time) which is available in our branches or on our website.

If you do not wish to participate in our Automated Program or you no longer wish to authorize coverage for ATM and everyday debit card transactions under our program, you may contact your local branch or call 1-800-388-4679.  If we do not pay an overdraft, your transaction will generally be returned or declined and certain fees may still apply.  You may change your authorization at any time.

In general, we post transactions received on a daily basis in the following order: (1) all deposits received are posted; (2) withdrawals are grouped by transaction type and then processed.  Items within each group are processed either in sequential order (i.e., check number order), or by dollar amount, with the lowest dollar amount transactions being processed before higher dollar amount transactions.

**STOP PAYMENTS** – A stop-payment order must be given in the manner required by law, must be received in time to give us a reasonable opportunity to act on it, and must precisely identify the number, date and amount of the item, and the payee.  You agree that "reasonable opportunity" depends on the circumstances but that we will have acted within a reasonable time if we make your stop payment request effective by the end of the business day on which we receive your stop payment request.  We will honor a stop-payment request by the person who signed the particular item, and, by any other person, even though such other person did not sign the item, if such other person has an equal or greater right to withdraw from this account than the person who signed the item in question.  A release of the stop-payment request may be made only by the person who initiated the stop payment.

**LIMITS TO LIABILITY** - You agree that we shall be relieved of and you release us from any and all liability for acting upon your instructions or failing to act on your instructions when we reasonably believe that to do so would cause us to be exposed to civil or criminal liability, or conflict with customary banking practices.  The Bank may refuse to follow any depositor instructions which we believe will expose us to potential liability under law.  We may require adequate security to protect

the Bank from any loss and expense incurred in following such instructions.  You agree that we shall not be liable for indirect, special or consequential damages regardless of the form of action and even if we have been advised of the possibility of such damages.  If we improperly fail to stop payment on an item, or improperly pay an item bearing an unauthorized signature, forged drawer's signature or forged endorsement or alteration, our liability, if any, shall be limited to the face amount of the item.

We are only responsible for providing services that are stated in this Agreement and do not assume fiduciary obligations on your behalf.  There is no guarantee that access to our services will be available at all times and we shall not be liable for interruption in service or loss, or for our failure or delay to perform our obligations, caused by matters beyond our control such as, among others, natural disasters, acts of war, fire, terrorist attack (or threat thereof), strikes, computer failures, or losses of power, communications or transportation facilities.

**DIRECT DEPOSITS** – If, in connection with a direct deposit plan, we deposit any amount in this account which should have been returned to the Federal Government for any reason, you authorize us to deduct the amount of our liability to the Federal Government from this account or from any other account you have with us, without prior notice and at any time, except as prohibited by law.  We may also use any other legal remedy to recover the amount of our liability.

**SUB-ACCOUNTS -**For accounting purposes, all checking accounts consist of two sub-accounts: a transaction sub-account to which all financial transactions are posted and a holding sub-account into which available balances above a preset level are transferred daily.  Funds will be re-transferred to your transaction sub-account to meet your transactional needs; however, all balances in the holding sub-account will be transferred to the transaction sub-account with the sixth transfer in any calendar month or monthly statement period.  Both sub-accounts are treated as a single account for purposes of your deposits and withdrawals, access and information (i.e., your statements), tax reporting, fees, etc.

**TEMPORARY ACCOUNT AGREEMENT** – If this option is selected, we may restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**RIGHT TO SET-OFF; SECURITY INTEREST** – You each agree that we may, to the maximum extent permitted by applicable law, without prior notice or demand, apply or set off the funds in this account or any of your other accounts against any debt or liability (including fees or service charges) you owe us or any of our affiliates now or in the future, and you grant us a security interest in each account and all funds and other property in each such account to secure such debt as it arise.  We have this right even if the accounts(s) we withdraw money from is a joint account and the debt we apply it to is owed by only one of you.  Likewise, we can withdraw money from an account owned by only one person and apply it to reduce the joint debt of that person or another person.

If the debt arises from a note, the set off amount includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the

note. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of the exercise of our right of set-off.

This right of set-off may not apply to this account if: (a) it is an Individual Retirement Account or other tax-deferred retirement account, or (b) the debt is created by a consumer credit transaction under a credit card plan, or (c) the debtor's right of withdrawal arises only in a representative capacity.

**USE OF FACSIMILE SIGNATURES AND COMPUTER SYSTEMS –** You authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money that are drawn on us regardless of by whom or by what means a facsimile signature(s) may have been affixed. Also, if you utilize an automatic check writing service, on-line banking, payment or other software systems, which may operate through the use of a computer or other internet device, you agree that you shall have the sole responsibility for maintaining security of any such computer or device. You further agree to indemnify and hold us harmless from and against any and all loss, cost, damage, liability or expense (including attorney's fees) that you or we may suffer or incur as a result of the unlawful use, unauthorized use or misuse by any person of any such device, computer, or software, any facsimile signature, computerized check, or misuse of access codes.

**RESTRICTIVE LEGENDS –** We are not required to honor any restrictive legend on checks you write unless we have agreed to the restriction in a writing signed by one of our officers. Examples of restrictive legends include, but are not limited to, "must be presented within 90 days" or "not valid for more than $1,000."

**TWO-SIGNATURE ACCOUNT RESTRICTIONS –** We do not offer accounts on which two signatures are required for a check or other withdrawal. Notwithstanding any provisions to the contrary on any signature card or other agreement you have with us, you agree that if any account purports to require two or more signers on items drawn on the account, such a provision is solely for your internal control purposes and is not binding on us. If more than one person is authorized to write checks or draw items on your account, you agree that we can honor checks signed by any authorized signer, even if there are two or more lines on the items for your signature and two signatures are required.

**FOREIGN CURRENCY –** Actively engaging in foreign exchange trading for profit or hedging purposes is strictly prohibited and may result in forfeiture or subsequent adjustments.

**AMENDMENTS AND TERMINATION –** We may change the terms of this Agreement from time to time as permitted by law. Your continued use of the account or continuation of the account for 30 days (or other required period) following the change will be deemed to be acceptance of the change by you. Rules governing changes in interest rates have been provided separately. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail.

**UNLAWFUL INTERNET GAMBLING -**In accordance with the requirements of the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG, this notification is to inform you that restricted transactions are prohibited from being processed through your account or relationship with our institution. Restricted transactions are transactions in which a person accepts credit, funds, instruments or other proceeds from another person in connection with unlawful Internet gambling.

**WAIVER –** The omission by us to require strict performance of any term or condition under this Agreement in any one or more instances shall not operate as a waiver of our right to insist upon strict performance of that or any other term or condition in the future. All waivers granted by us must be in writing and signed by us to be effective.

**JURY TRIAL WAIVER – SUBJECT TO APPLICABLE LAW, YOU AND WE AGREE TO WAIVE AND GIVE UP OUR RIGHTS TO A TRIAL BEFORE A JURY.**

# EXHIBIT 2

# Overdraft Practices

**Policy Statement.**
It is the policy of Community Bank, NA ("Bank" or "we") to comply with all applicable laws and regulations and to conduct business in accordance with applicable safety and soundness standards.  The Bank offers both Automated and Non-Automated Overdraft Protection Programs to our customers, wherein for a fee, and subject to certain limitations, we may cover certain items presented for payment even though you do not have sufficient available funds in your account.  This document is intended to summarize our general practices with regard to these programs.  This document may be amended from time to time.  If you have questions with regard to any of our practices or the status of certain transactions you should contact your local branch for assistance.  Certain terms and conditions of this document may differ for commercial, municipal and other "non-consumer" accounts.  Customers may decline to participate in key aspects of our Programs.

**Relationship to Deposit Account Terms and Conditions Agreement.**
The Deposit Account Terms and Conditions Agreement provided to you at the time you opened your account and as updated from time to time, as well as relevant state and federal law govern the obligations and rights of the account holder(s) and Bank with regard to your account.  The Deposit Account Terms and Conditions Agreement (and all amendments thereto) shall control any conflict between this document and the Deposit Account Terms and Conditions Agreement.  A copy of the current Deposit Account Terms and Conditions Agreement is available on request or on our website.

**General Terms.**
An overdraft occurs when you do not have enough money in your account to cover a transaction, but we cover the transaction on your behalf. An unavailable funds transaction occurs when you do not have sufficient available funds in your account to cover a transaction, but we cover the transaction on your behalf.  While subject to change, our funds availability policy is to generally make funds from your deposits available to you on the next business day after the day we receive your deposit.  Unless otherwise noted, for purposes of this document, overdraft and unavailable funds transactions will generally be referred to as "overdrafts".  We can cover your overdrafts in different ways:

1. We offer a standard automated Overdraft Protection Program (Automated Program) with most accounts.
2. Accounts not enrolled in the Automated Program, will be referred to as Non-Automated Program accounts.
3. We also offer other products and services, such as overdraft credit lines or an overdraft sweep service from a savings or money market account (consumers only), which may be less expensive than our Automated and Non-Automated Overdraft Protection Programs. To learn more, ask us about these products or visit our website.

Helpful tips for avoiding overdrafts can be obtained through branch personnel and are periodically posted on our website at www.communitybankna.com.  This document explains our standard Automated and Non-Automated Overdraft Protection Programs.

**Bank's right to refuse payment; Your obligation to pay.**
The Bank's Automated and Non-Automated Overdraft Protection Programs are not lines of credit.  We are not obligated to cover any item presented for payment if your account does not contain sufficient funds.  While we will have the discretion to cover overdrafts on accounts, any such payment is a discretionary courtesy, and not a right of the customer or an obligation of Bank.  Bank, in its sole and absolute discretion, can cease covering overdrafts at any time without prior notice of reason or cause if we feel it is inappropriate to extend credit/ cover the transaction. If we do not authorize and cover an overdraft, your transaction will generally be returned or declined and certain fees may still apply.  The total amount of any overdraft (including the amount of overdraft fees and other applicable fees) is due and payable on demand, and each relevant party will continue to be liable, jointly and severally, for all such amounts, as described in our agreements with you and under applicable law.

**Order of Processing.**

Generally speaking, we post transactions received on a daily basis in the following order:

1. All deposits received are posted.
2. Withdrawals are grouped by transaction type and then processed. Items within each group are processed either in sequential order (i.e., check number order), or by dollar amount, with the lowest dollar amount transactions being processed before higher dollar amount transactions.

**Fees.**

Subject to certain notification requirements, overdraft and related fees are subject to change. Fees may be waived at our discretion in certain circumstances. Our current overdraft and related fees are:

- We will charge you a fee of $32 each time we pay an overdraft, return an item due to insufficient funds (NSF)*, or pay an item based on unavailable funds.
- There is a four per day limit on each of the above fees we can charge you. It is the intention of Bank that customers not incur more than four combined overdraft, NSF, and unavailable funds fees per day. Customers charged more than four overdrafts, NSF, and unavailable funds fees in a single day will receive a rebate for each transaction in excess of four upon notifying Bank.
- We will charge you a fee of $5 for each consecutive business day your account remains overdrawn, starting on the 5th business day

\* You will not be charged an overdraft, NSF, or Consecutive Day OD fee if your aggregate overdrawn balance is less than $5.

**Automated Program Eligibility and Limits.**

If your account meets certain criteria, has been open for at least forty-five (45) days, and thereafter you maintain your account in good standing, Bank may extend coverage to you under our Automated Program and will have the discretion to cover transactions, generally up to a maximum limit. Maximum limits are determined by product type. This limit applies to the negative balance (including the amount of overdraft fees and other applicable fees) of your account. We may extend smaller limits for accounts open less than forty-five days and other limits may apply. Certain types of customers or accounts are generally not eligible (i.e., estates, rep payee, trusts, UTMA, PUTMA, student, IOLA, IOLTA funeral home, landlord/ tenant, non-profit, public funds, foreign customers). Other exclusions may apply. Enrollment in the Automated Program will be at the Bank's sole discretion. Customers may be removed from or re-instated into the Automated Program from time to time based on criteria established by the Bank. Eligibility and good standing criteria are determined at the discretion of the Bank and may change from time to time. Your account could become overdrawn in excess of the established Automated Program limit with Bank approval. As set forth above, our agreement to pay any charges up to or exceeding the limit will not require that we do so in the future or affect your obligations to repay. Customers may elect not to participate in our Automated Program by following the instructions set forth below. Customers not enrolled in the Bank's Automated Program will default to and be considered participants in the Non-Automated Program.

**Automated Program Covered Transactions and Elections.**

Covered Transactions under our Automated Program include all banking transactions that may result in an overdraft including but not limited to:

- In person withdrawals
- Checks
- ACH debit transactions (electronic payments)
- Online banking transactions
- Online Bill Pay transactions
- Telephone Banking Transfers
- Visa Check Card purchases
- ATM transactions

2

- Fees and charges from CBNA
- Returned deposited items
- Withdrawals by other electronic means

<u>For Consumer Accounts Only</u>, effective July 1, 2010 all new customers must tell us whether or not they wish to have ATM and everyday debit card transactions that would result in an overdraft paid.  Prior to August 15, 2010 all consumer account holders were provided an opportunity to make this election.  Consumer accounts that did not reply were deemed to have elected not to pay these items.  See the document entitled "What You Need to Know About Overdrafts and Overdraft Fees" for more information about this election.  Customers can make or change their elections at any time by calling or visiting their local branch; by calling 1-800-388-4679; or by completing the attached document referenced above.  Unless you instruct us otherwise (see below), regardless of whether or not you have ATM and everyday debit card transactions paid, customers are still enrolled in our Automated Program.

Customers may elect not to participate in our Automated Program by calling or visiting their local branch or by calling 1-800-388-4679.  Bank reserves the right to remove or reinstate a customer from the Automated Program at its sole discretion from time to time and without advance notice.

**<u>Non-Automated Program Covered Transactions.</u>**
Customers not enrolled in the Bank's Automated Program (whether due to an election or at Bank's discretion) will default to and be considered participants in the Non-Automated Program.  Among other factors, participants in our Non-Automated Program will have ATM and everyday debit card items that would result in an overdraft declined or rejected.   In addition, participants in our Non-Automated Program will generally have other electronic transactions such as non-recurring debit card, in-branch, Internet banking, and telephone banking transactions rejected or declined, if at the time of the transaction it does not appear that sufficient funds are present.  Exceptions may apply.

In general, for participants in the Non-Automated Program, branch personnel will make a determination to pay or return checks, ACH, and other applicable transactions that are presented, where the result of the transaction would be a negative balance due to insufficient funds.  Overdraft, NSF, merchant and other fees may still apply.  In general, if an item is not paid it will be returned or rejected.  NSF, merchant and other fees may still apply.

Overdraft Protection Program Practices Rev. 5/1/2014

3

**What You Need to Know About**
**Overdrafts and Overdraft Fees**

An <u>overdraft</u> occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdraft in two different ways:

1. We have **standard overdraft practices** that come with your account.
2. We also **offer overdraft protection plans,** such as a ChekCredit Line of Credit, or a sweep service from your savings or money market account, which may be less expensive than our standard overdraft practices.  To learn more, ask us about these plans.

This notice explains our <u>standard overdraft practices</u>

➢ **What are the <u>standard overdraft practices</u> that come with my account?**
   We <u>may</u> authorize and pay overdraft items for the following types of transactions:
   - Checks and other transactions made using your checking or money market account number
   - Automatic bill payments
   - Recurring debit card transactions (example: monthly membership dues)

   We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
   - ATM transactions
   - Everyday debit card transactions

   We may pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

   If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined.

➢ **What fees will I be charged if Community Bank, N.A. pays my overdraft or pays an item drawn on unavailable funds?**
   Under our standard overdraft practices:
   - We will charge you a fee of $32 each time we pay a non-sufficient* or overdraft* item or each time you draw on unavailable funds.
   - Also, we will charge you a fee of $5 for each consecutive* business day your account remains overdrawn beginning on the 5th business day.
   - *NSF/Overdraft/Consecutive OD fees are not assessed for aggregate overdrawn balances of less than $5.00
   - Non-sufficient, Overdraft, and Unavailable Fund Fees are each limited to 4 per day.

➢ **What if I want Community Bank, N.A. to authorize and pay overdrafts on my ATM and everyday debit card transactions?**  If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions complete the form below and present it to your local branch or mail it to: Community Bank, N.A. 1 Tallman Drive, Canton, New York 13617.  You may revoke your consent at any time by contacting us either in person, or by mail or by phone.

| **Opt - In Authorization**<br><br>Community Bank N.A. | **I want Community Bank, N.A. to authorize and pay overdrafts on ATM and every day debit card** transactions. <mark>Note that regulations require separate forms for each of your checking and money market accounts.</mark><br><br>**Account Number** _____<br><br>**Printed Name:**_____ **Date**_____<br><br>**Signature** _____ |
| --- | --- |

T-428 (Rev. 11/18/2014) Pcform